Revised June 6, 2002

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-20497

_____


UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

NOBELDA CABRERA

Defendant - Appellant

_____

No. 01-20501

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

LEDA CABRERA

Defendant - Appellant

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

April 3, 2002

Before KING, Chief Judge, and GARWOOD and HIGGINBOTHAM, Circuit
Judges.

PER CURIAM:

Defendants-Appellants Nobelda and Leda Cabrera were convicted under 18 U.S.C. § 371 (1994) of conspiracy to encourage or induce illegal immigrants to come to, enter, or reside in the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(iv) (1994).  In this consolidated appeal, Nobelda and Leda Cabrera urge this court to vacate their sentences and remand for resentencing on the ground that the district court committed three errors in calculating the total offense levels on which their sentences are based.  They argue that the district court improperly (1) increased their offense levels based on the erroneous finding that the offense involved the smuggling of twenty-five or more illegal immigrants into the United States, (2) increased their offense levels based on the erroneous finding that Nobelda and Leda Cabrera acted as leaders or organizers in the conspiracy, and (3) refused to reduce their offense levels for acceptance of responsibility.  For the following reasons, we conclude that the district court's findings on these three issues are not clearly erroneous, and thus we AFFIRM Nobelda and Leda Cabrera's sentences.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Nobelda and Leda Cabrera ("Nobelda" and "Leda") were among six defendants charged in a single indictment with violating 18 U.S.C. § 371 by conspiring "to commit an offense against the United States, that is, encouraging and inducing aliens to come

to, enter and reside in the United States" in violation of 8 U.S.C. § 1324(a)(1)(A)(iv). The indictment alleged that Nobelda and Leda were part of an operation that assisted individuals in illegally entering the United States from Mexico by paying parents to permit their children to accompany immigrants across the border. The children provided a measure of security for illegal immigrants attempting to enter the United States because the U.S. Border Patrol had a policy of returning families with young children to Mexico rather than detaining them and charging them with illegal entry.

Both Nobelda and Leda pled guilty, preserving their right to appeal their sentences. The factual basis proffered by the government in support of their pleas at their rearraignment was derived from an investigation conducted by the Immigration and Naturalization Service ("INS").[1] Regarding Nobelda, the government stated that two couples had told INS agents that the couples had been paid to give their young daughters to Nobelda and Juan Ramon Rodriguez (Nobelda's husband and co-defendant) so that undocumented immigrants could pose as the children's parents while crossing the United States-Mexico border. With respect to Leda, the government asserted that she "assisted in the conspiracy by . . . going to Western Union in order to pick up money that had been wired as payments for the smuggling fee" and

_____

[1] Nobelda and Leda pled not guilty at their initial arraignment.

3

by taking "phone messages[] on behalf of Nobelda Cabrera regarding the smuggling activity."  Both Nobelda and Leda admitted to this conduct before entering their guilty pleas.

At their sentencing hearing,[2] Nobelda and Leda presented arguments to the district court in support of their previously-filed written objections to the findings made by the probation officer in their presentence reports ("PSRs").  Nobelda and Leda agreed that their PSRs properly (1) assigned each of them a base offense level of 12 pursuant to subsections 2X1.1(a) and 2L1.1(a)(2) of the U.S. Sentencing Guidelines ("Sentencing Guidelines"),[3] and (2) increased their offense levels by two because of the involvement of minors in the offense.[4]  However, they objected to the following three steps in the calculation of the total offense levels set out in their PSRs.  First, Nobelda and Leda objected to the six-level increase based on the PSRs' finding that the offense involved the smuggling of between

---

[2]  At Nobelda and Leda's attorneys' suggestion, the district court conducted one sentencing hearing for both Nobelda and Leda.

[3]  Section 2X1.1, the guideline that governs sentencing for conspiracy offenses, mandates the use of the base offense level in the guideline for the substantive offense.  U.S. SENTENCING GUIDELINES MANUAL § 2X1.1(a) (2000).  Section 2L1.1, the guideline applicable to violations of 8 U.S.C. § 1324(a) (the substantive offense in the instant case), prescribes a base offense level of 12.  Id. § 2L1.1(a)(2).

[4]  See U.S. SENTENCING GUIDELINES MANUAL § 3B1.4 (2000) ("If the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by 2 levels.").

4

twenty-five and ninety-nine illegal immigrants into the United States.  See U.S. SENTENCING GUIDELINES MANUAL § 2L1.1(b)(2)(B) (2000) (providing that "[i]f the offense involved the smuggling, transporting, or harboring of [twenty-five to ninety-nine] unlawful aliens," then "add 6" to the base offense level). According to the PSRs, the INS investigation revealed that thirty illegal immigrants were smuggled into the United States in the course of the conspiracy.  At the sentencing hearing, the government called upon INS Agent Elizar Paredes to explain the basis of this finding in the PSRs.  Paredes testified that two couples and one woman admitted to "renting out their [children]" for use in the smuggling operation on a combined total of "approximately 15 occasions."  Paredes explained that the INS "made the assumption that [the defendants] were bringing in couples" with each child, in which case the number of illegal immigrants smuggled would be thirty (i.e., two illegal immigrants on each of the fifteen occasions in which the parents permitted their children to be used in the smuggling operation).  Paredes further stated that "the preponderance of the evidence" supported the assumption that two illegal immigrants had been smuggled on each occasion because "the whole purpose was to have the smuggled aliens pose as a family unit," and thus "[t]hey would need a father and mother."  However, Paredes acknowledged that "on one occasion [we did] find that only one person used the child[,] [s]o that would be . . . 29 persons [were smuggled]."

5

Nobelda and Leda argued that the fact that only one person had taken a child on one of the smuggling trips rendered the assumption that two persons were smuggled on the other trips too speculative to justify the six-level increase for an offense involving the smuggling of twenty-five or more illegal immigrants. According to Nobelda and Leda, at most, the evidence established that the offense involved the smuggling of between six and twenty-four illegal immigrants, justifying an offense-level increase of only three. See U.S. SENTENCING GUIDELINES MANUAL § 2L1.1(b)(2)(A) (2000). Concluding that a preponderance of the evidence supported the PSRs' finding that the offense involved the smuggling of twenty-five or more illegal immigrants, the district court denied Nobelda and Leda's objection and adopted this finding.

After increasing Nobelda and Leda's offense level by six based on the number-of-immigrants finding, the probation officer arrived at the total offense level of 24 after applying a four-level increase based on his determination that Nobelda and Leda played "organizer or leader" roles in the offense. Id. § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase [the offense level] by 4 levels."). Finally, the probation officer found that Nobelda and Leda had not adequately accepted responsibility for the offense to warrant a decrease in their offense levels. See id. § 3E1.1(a). Nobelda

6

and Leda objected to both of these findings, arguing (1) that there was insufficient evidence that they had exercised the sort of authority that would justify a leader/organizer finding, and (2) that they were entitled to three-level decreases in their offense levels because their guilty pleas, colloquies, and previous interactions with investigating officers demonstrated that they had sufficiently accepted responsibility for their roles in the offense. The district court denied both objections and adopted the PSRs' findings without qualification.

Factoring in their criminal history categories, the district court determined that Nobelda and Leda were each subject to a range of 57 to 60 months' imprisonment.[5] The district court imposed a prison sentence of 60 months on both Nobelda and Leda,

---

[5] Nobelda was assigned a criminal history category of II, and Leda was assigned a category of I. With total offense levels of 24, the applicable guideline ranges were 57 to 71 months' imprisonment for Nobelda and 51 to 63 months' imprisonment for Leda. See U.S. SENTENCING GUIDELINES MANUAL § 5A (2000). However, given that the statutory maximum prescribed by the statute of conviction (i.e., 18 U.S.C. § 371) is five years, Nobelda was subject to a range of 57 to 60 months and Leda to a range of 51 to 60 months. See id. § 5G1.1(c)(1). Apparently in error, the district court stated — both at the sentencing hearing and in the final judgment — that the range applicable to Leda was 57 to 60 months, rather than 51 to 60 months. (The probation officer also incorrectly determined in Leda's PSR that she was subject to the same imprisonment range as Nobelda.) Leda did not challenge the determination of her guideline range in the district court, and she has not raised the issue in this appeal. In any event, given the district court's decision that the purposes of the Sentencing Guidelines would be best served by imposing the maximum sentence of 60 months on both Nobelda and Leda, it is clear that the court's error in determining Leda's guideline range is harmless.

7

explaining that "[t]hey used multiple children, little babies, to do this, so certainly I believe that a sentence of both these women at the high end of the guideline range is appropriate." The court further sentenced Nobelda and Leda to three years' supervised release and ordered them to pay a special assessment of $100.

Nobelda and Leda timely appealed their sentences, reasserting the three challenges that they made in the district court.

## II.  STANDARD OF REVIEW

To succeed in an appeal of a sentence imposed pursuant to the Sentencing Guidelines, a defendant must demonstrate that the sentence was imposed in violation of the law, was a result of an incorrect application of the relevant guidelines, or is greater than the applicable guideline range and was unreasonable.  18 U.S.C. § 3742(a) (1994); see also United States v. Cho, 136 F.3d 982, 984 (5th Cir. 1998).  This court reviews a district court's legal interpretation and application of the sentencing guidelines de novo and its factual findings for clear error.  United States v. Lowder, 148 F.3d 548, 552 (5th Cir. 1998).  "[G]iv[ing] due regard to the opportunity of the district court to judge the credibility of the witnesses," 18 U.S.C. § 3742(e), we will deem the district court's factual findings clearly erroneous only if, based "on the entire evidence," we are "left with the definite

8

and firm conviction that a mistake has been committed."  United States v. Cooper, 274 F.3d 230, 238 (5th Cir. 2001) (citation omitted).

### III.  THE INCREASE BASED ON THE FINDING OF THE NUMBER OF ILLEGAL IMMIGRANTS SMUGGLED

Section 2X1.1 is the guideline that applies to conspiracy, attempt, and solicitation offenses that are not expressly covered by the guideline for the "substantive offense," i.e., "the offense that the defendant was convicted of soliciting, attempting, or conspiring to commit."  U.S. SENTENCING GUIDELINES MANUAL § 2X1.1(c)(1), cmt. n.2 (2000).  The conspiracy offense of which Nobelda and Leda were convicted, i.e., conspiracy to violate 8 U.S.C. § 1324(a)(1)(A)(iv) by encouraging or inducing illegal immigrants to come to, enter, or reside in the United States, is not expressly covered by a specific offense guideline.  See id. § 2X1.1 cmt. n.1 (providing a list of the offense guidelines that expressly cover conspiracies, which list does not include section 2L1.1, the guideline for § 1324(a) offenses).  Section 2X1.1(a) directs the sentencing court to use the base offense level from the guideline for the substantive offense and to apply "any adjustments from [that] guideline for any intended offense conduct that can be established with reasonable certainty."  Id. § 2X1.1(a).  Such "adjustments" are offense-level increases or decreases that are required where certain "specific offense characteristics, cross references, [or] special

9

instructions contained in the particular guideline" apply.  Id.
§ 1B1.1(b).  Accordingly, in the instant case, the district court set Nobelda and Leda's base offense level at 12, as required under section 2L1.1.  See id. § 2L1.1(a)(2).  The district court then increased the base offense level by six based on that court's determination that one of the specific offense characteristics enumerated in section 2L1.1 had been established by a preponderance of the evidence, namely, that the "offense involved the smuggling, transporting, or harboring of [twenty-five to ninety-nine] unlawful aliens."  Id. § 2L1.1 (b)(2)(B).

Nobelda and Leda argue that the district court's number-of-immigrants finding is clearly erroneous because the government failed to adduce evidence sufficient under subsection 2X1.1(a)'s "reasonable certainty" standard to support that finding.  In support of this argument, Nobelda and Leda analogize the instant case to United States v. Rome, 207 F.3d 251 (5th Cir. 2000), in which this court vacated the defendant's sentence for conspiracy to steal firearms after determining that the district court's finding that the defendant intended to steal over fifty firearms had not been established with the "reasonable certainty" required by subsection 2X1.1(a).  Id. at 252, 256.  In particular, Nobelda and Leda point out that in Rome this court relied on the statement in section 2X1.1's commentary that "[s]peculative specific offense characteristics will not be applied," id. at 254 (quoting U.S. SENTENCING GUIDELINES MANUAL § 2X1.1 cmt. n.2) (emphasis

10

omitted), thus rejecting as too speculative the district court's finding that the defendant must have intended to steal all the guns that were in the store that he attempted to rob merely because they were in the store, id. at 256 (noting that the district court's finding on the number of guns "is the type of speculative inference the sentencing guideline comments specifically disapprove").  According to Nobelda and Leda, like the district court's inference regarding the number of guns in Rome, the district court's inference in the instant case that two immigrants must have been smuggled on all but one of the fifteen occasions in question is too speculative to satisfy the reasonable-certainty standard.

The government responds that Rome is inapposite to the instant case because the reasonable-certainty standard of subsection 2X1.1(a) is applicable only to conduct that was allegedly intended to occur, not to conduct that allegedly did occur, such as the smuggling of immigrants at issue in the instant case.  Thus, the government contends, the district court properly applied the preponderance-of-the-evidence standard, and that court's finding that the smuggling of twenty-five or more illegal immigrants had been established by a preponderance of the evidence was not clearly erroneous.

We conclude that the government is correct that subsection 2X1.1(a)'s reasonable-certainty standard is specific to findings of intended conduct.  As noted above, subsection 2X1.1(a)

11

provides that for a conspiracy offense not expressly covered in another guideline, the sentencing court must apply the base offense level in the guideline for the substantive offense "plus any adjustments from such guideline <u>for any intended offense conduct</u> that can be established with reasonable certainty."  <u>Id.</u> § 2X1.1(a) (emphasis added).  The government correctly notes that the commentary to section 2X1.1 further clarifies the intended/actual distinction by noting that the sentencing court is to begin with the base offense level in the guideline for the substantive offense and then apply the appropriate adjustments triggered by any intended offense conduct that is established with reasonable certainty (conduct "specifically intended") <u>or</u> by actual offense conduct.  U.S. SENTENCING GUIDELINES MANUAL § 2X1.1 cmt. n.2 (2000).[6]  Indeed, it makes sense that the Sentencing Commission would specifically direct the sentencing court to apply "any adjustments . . . for any <u>intended</u> offense conduct that can be established with reasonable certainty" because "[u]nless otherwise specified," the Sentencing Guidelines' definition of the "relevant conduct" that may be considered in

---

[6]  The commentary states:
Under § 2X1.1(a), the base offense level will be the same as that for the substantive offense.  But the only specific offense characteristics from the guideline for the substantive offense that apply are those that are determined to have been specifically intended <u>or</u> actually occurred.
U.S. SENTENCING GUIDELINES MANUAL § 2X1.1 cmt. n.2 (2000) (emphasis added).

12

determining whether a given adjustment applies is limited to conduct that has <u>occurred</u>.  <u>Id.</u> § 1B1.3(a)(1).  As the government points out, the district court based the six-level increase on its finding that the conspiracy offense involved the actual smuggling —— not the intended smuggling —— of twenty-five or more immigrants.[7]

We note that our conclusion that the reasonable-certainty standard governs findings of intended conduct only does not mean that we are not guided in our review by the admonition in section 2X1.1's commentary emphasized by Nobelda and Leda —— i.e., that "[s]peculative specific offense characteristics will not be applied."  That admonition is just as pertinent where the basis for a specific offense characteristic is actual offense conduct as where that basis is intended offense conduct.  Although preserving the sentencing court's traditional authority to consider any "relevant information without regard to its admissibility under the rules of evidence at trial," the Sentencing Guidelines require that any information used by the court in sentencing a defendant have "sufficient indicia of reliability to support its probable accuracy."  <u>Id.</u> § 6A1.3(a), § 6A1.3 cmt.  This court has interpreted subsection 6A1.3(a)'s

---

[7]  In asserting that the reasonable-certainty standard applies to the district court's number-of-immigrants finding, Nobelda and Leda neither address subsection 2X1.1(a)'s reference to "intended" (but not "actual") offense conduct nor argue that the district court's finding was one of intended conduct.

13

"sufficient indicia of reliability" language "to require that the facts used by the district court for sentencing purposes be reasonably reliable." United States v. Rogers, 1 F.3d 341, 343-44 (5th Cir. 1993).

According to the PSRs, INS agents were aware of the number of immigrants smuggled on three of the fifteen trips in question. On two of the trips, U.S. Border Patrol officers apprehended two immigrants posing as the mother and father of a young child, and on the other trip, officers apprehended one immigrant posing as a child's father. Although the PSRs' account of the INS investigation noted that only one illegal immigrant entered the United States on one of the trips, the PSRs assumed that two immigrants were smuggled on each occasion in determining that Nobelda and Leda's offense involved the smuggling of thirty immigrants. Paredes testified that notwithstanding the undisputed fact that only one immigrant was smuggled on at least one occasion, he believed that the multiplier estimate should be two immigrants (rather than one) per trip because (1) "the whole purpose was to have the smuggled aliens pose as a family unit, so . . . [t]hey would need a father and mother," and (2) the parents were told that immigrants would pose as the children's "parents," not "parent."

The district court agreed with the government that it had established by a preponderance of the evidence that twenty-nine immigrants were smuggled, reasoning that "it would seem to me to

14

be counter-intuitive that every single one of these [trips] would [involve] one person, since the whole point was to have a family."  While Nobelda and Leda acknowledge that the information in their PSRs supports a finding that their offense involved the smuggling of between six and twenty-four immigrants (which would subject them to an offense-level increase of three, rather than six), they argue that Paredes's testimony and the PSRs do not provide an adequate evidentiary basis for the inference that two immigrants were smuggled on each of the other twelve trips for which the number of immigrants was not known.  Nobelda and Leda further contend that the two-per-trip inference is also rendered unreliable by the undisputed fact that only one immigrant posed as a child's parent on one of the fifteen trips.

We are unable to find any published decisions, either from this court or our sister circuits, reviewing a number-of-immigrants finding based on an estimate such as that at issue in the instant case.  However, there are a number of cases reviewing a district court's use of estimates of drug quantity or financial loss for sentencing purposes.[8]  Although this court has

_____

[8]  The base offense level for drug offenses depends on the drug type and quantity, see U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a), (c) (2000), and the base offense level for taxation offenses depends on the amount of tax loss, see id. § 2T1.1(a). Financial loss is a specific offense characteristic of fraud, theft, and other similar offenses; the enhancement in the offense level increases with the amount of loss.  See id. § 2B1.1(b)(1) ("Larceny, Embezzlement, and Other Forms of Theft; Receiving, Transporting, Transferring, Transmitting, or Possessing Stolen Property"); § 2F1.1(b)(1) ("Fraud and Deceit; Forgery; Offenses

15

recognized that a district court's estimates of drug quantity and financial loss must be supported by reasonably reliable information, United States v. Robichaux, 995 F.2d 565, 571 (5th Cir. 1993) (loss); United States v. Sherrod, 964 F.2d 1501, 1508 (5th Cir. 1992) (drug quantity), we have not specifically addressed, as a number of other circuits have, the particular nature of "multiplier" estimates of the type at issue in the instant case, where a known quantity involved in a particular occurrence (such as the amount of drugs sold in a transaction) is extrapolated to other such occurrences. In United States v. Rivera-Maldonado, 194 F.3d 224 (1st Cir. 1999), for example, the First Circuit held that the district court clearly erred in using a "drug-quantity estimate per sale [that] was based on eleven controlled buys throughout the entire six-month investigation." Id. at 233. The First Circuit reasoned that the record did not contain sufficient indicia of reliability to justify the sentencing court's use of the drug-quantity estimate per sale (i.e., the "multiplier"). Id. at 232-33. Specifically, the Rivera-Maldonado court determined that there was a lack of sufficient indicia that the multiplier estimate was "reasonably representative" of the drug quantity involved in other transactions. Id. at 232. Based on similar reasoning, the Second Circuit concluded in United States v. Shonubi, 998 F.2d 84

Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States").

16

(2d Cir. 1993), that the district court improperly inferred from the fact that the defendant was found to be smuggling 427.4 grams of heroin to the United States from Nigeria on one occasion that he must have smuggled equivalent amounts during seven other trips to and from Nigeria.  Id. at 89-90.  The Shonubi court explained that although the record supported the determination that the defendant had smuggled heroin on these other trips, "there is simply no proof he imported 427.4 grams of heroin on each of his seven other trips."  Id. at 89.  Consequently, the Second Circuit concluded that "[t]he government failed to prove by a preponderance of the evidence that Shonubi imported more than 427.4 grams of heroin."  Id. at 90.

We conclude that, unlike the drug quantity multipliers denounced by the courts in Rivera-Maldonado and Shonubi, there is sufficient reliable evidence that the multiplier used by the district court in the instant case is reasonably representative of the number of immigrants smuggled on each trip.  The district court's findings that immigrants were smuggled on fifteen trips and that two immigrants were smuggled on the twelve trips on which immigrants were not apprehended are adequately supported by a preponderance of the evidence in the record.[9]  Further, the

_____

[9]  Nobelda and Leda contend that the finding of fifteen trips is improper because the parents' statements relied on by the PSRs indicate a collective total of only thirteen trips. However, a careful reading makes clear that the description in the PSRs of the parents' statements given to INS agents does account for all fifteen trips that the government maintains took

17

record contains sufficient indicia of reliability demonstrating the probable accuracy of the multiplier estimate of two immigrants per trip.  The PSRs' findings are based on the information gathered by the INS during its investigation of the conspiracy, and this information was confirmed by Paredes in his testimony at the sentencing hearing.  See Cooper, 274 F.3d at 239-40 (finding the district court's adoption of the PSR's drug quantity finding was not clearly erroneous where "[i]n addition to the PSR, . . . the district court had the benefit of an affidavit and live testimony from [an agent of the Bureau of Alcohol, Tobacco, and Firearms] concerning the investigation into the [drug distribution] organization"); United States v. Gracia, 983 F.2d 625, 629-30 (5th Cir. 1993) ("Presentence reports generally bear indicia of reliability sufficient to permit reliance thereon at sentencing; this case, involving a report based on the results of the DEA investigation, is no exception.").  Based on their investigation, INS agents concluded that the conspirators used children to secure the benefit of the Border Patrol's policy of leniency toward families with young children by paying parents for the use of their children in the smuggling operation.[10]  Where, as here, the defendants have not

place.

[10]  In this appeal, the government also asserts that there is additional circumstantial evidence in the record that, although not relied on by the district court, supports a number-of-immigrants finding of at least twenty-five (the lower end of

18

presented evidence rebutting a finding in their PSRs and the PSRs contain (1) information that provides an adequate evidentiary basis for that finding and (2) sufficient indicia that this information is reliable, the district court may adopt the finding without further inquiry. See Rome, 207 F.3d at 254. Accordingly, the district court did not clearly err in attributing the smuggling of twenty-nine immigrants to Nobelda and Leda for sentencing purposes.

## IV. THE INCREASE BASED ON THE LEADER/ORGANIZER FINDING

Nobelda and Leda also argue that the district court erroneously denied their objections to the PSRs' findings that they had "leader or organizer" roles in the conspiracy. Subsection 3B1.1(a) of the Sentencing Guidelines instructs the sentencing court that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(a) (2000). The district court's determination that a defendant was a leader or organizer

---

the range requiring an offense-level increase of six). The government points to Paredes's testimony that Nobelda and Leda were found to be in possession of (1) receipts for money orders that had all been sent to the same address (which the INS apparently concluded were payments for smuggling), and (2) two lists containing a total of twenty-five names, including the names of six illegal immigrants identified by the INS in the course of its investigation. Five of the six immigrants named in the lists are the two couples and the one man who posed as parents of children and were apprehended by Border Patrol officers.

under subsection 3B1.1(a) is a factual finding that this court reviews for clear error.  United States v. Ayala, 47 F.3d 688, 689-90 (5th Cir. 1995).

The probation officer based the recommended leader/organizer increase in offense level primarily on the findings that Nobelda and Leda were responsible for supplying young children to accompany illegal immigrants across the border and that they supplied these children by recruiting and paying the children's parents and then taking the children to Mexico from Houston.  The PSR also stated that Nobelda and Leda recruited their co-defendant Jose Antonio Guerrero-Funez and directed his actions in allegedly collecting the smuggling fees and helping to transport immigrants.  As further evidence supporting the conclusion that Leda was a leader/organizer, the PSR pointed to airline records for the relevant time period indicating that Leda had traveled from Houston to Harlingen, Texas "numerous times" with an infant on her lap and had returned to Houston without an infant.[11]

In the district court, Nobelda argued that although she had "enlisted the help of others during the course of the scheme," it was improper to characterize her as a "leader" or "organizer" because there was no evidence that she exercised control or

---

[11]  In interviews with INS agents, the parents who had permitted their children to be used in the smuggling operation stated that they had been informed by Nobelda that their children would be flown to Harlingen and then would cross the border by land to arrive in Matamoros, Mexico.

20

authority over anyone else involved in the offense.  At most,
Nobelda maintained, the evidence established that she had acted
as a "manager or supervisor," which warrants an offense-level
increase of only three under the Sentencing Guidelines.  See U.S.
SENTENCING GUIDELINES MANUAL § 3B1.1(b) (2000).  Leda similarly argued
that she was not an "organizer" or "leader" because there was no
evidence that she had control or authority over the actions of
others.  Leda further asserted that "there is reason to believe
that her role was actually minimal."  Specifically, she pointed
out that the INS discovered during its investigation that
"Nobelda used Leda's name in much of the carrying out [of] the
details of the conspiracy."  Consequently, Leda maintained, it
was improper to assume that she had been the "Leda Cabrera"
listed in the airline records.  Agreeing with the government that
the preponderance of the evidence indicated that both Nobelda and
Leda had acted as leaders or organizers, the district court
adopted the PSRs' findings and applied the four-level increase
pursuant to subsection 3B1.1(a).

As noted above, a district court may adopt the facts
contained in a PSR without further inquiry if those facts have an
adequate evidentiary basis with sufficient indicia of reliability
and the defendant does not present rebuttal evidence or otherwise
demonstrate that the information in the PSR is unreliable.  See
Rome, 207 F.3d at 254.  Nobelda and Leda did not offer evidence
to rebut the leader/organizer findings in the PSRs, but rather

21

contend that there is insufficient evidence to support those findings. Nobelda and Leda do not dispute the finding that they recruited and paid parents to obtain children for use in the smuggling operation, instead arguing that these actions amounted to no more than "[m]erely tending to simple logistics" and thus cannot support the district court's application of subsection 3B1.1(a).[12] Quoting from the Ninth Circuit's opinion in United States v. Harper, 33 F.3d 1143 (9th Cir. 1994), Nobelda and Leda maintain that a leader/organizer increase is warranted under subsection 3B1.1(a) only if the government shows that "the defendant exercised some control over others involved in commission of the offense [or was] responsible for organizing others for the purpose of carrying out the crime." Id. at 1151 (internal quotations omitted) (alteration in original).

The commentary to section 3B1.1 sets out an array of factors that the sentencing court "should consider" "[i]n distinguishing a leadership and organizational role (requiring a four-level increase) from one of mere management or supervision (requiring a three-level increase)":

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

---

[12] Nobelda and Leda also have never disputed the finding that there were five or more participants in the conspiracy.

22

U.S. Sentencing Guidelines Manual § 3B1.1 cmt. n.4 (2000).  The district court may find that a defendant exercised a leader/organizer role by inference from the available facts.  See Ayala, 47 F.3d at 690.  In light of the factors enumerated in section 3B1.1's commentary, the evidence cited in Nobelda and Leda's PSRs provides an adequate basis for the inference that Nobelda and Leda were leaders or organizers.  The PSR describes interviews conducted by INS agents in which the parents identified Nobelda and Leda and stated that they had offered the parents money in exchange for the use of their children.  One of these parents stated that she had been told by Nobelda that a flight to Harlingen would be part of the child's trip to Matamoros, and that the child would return to the United States with illegal immigrants.  The finding that Nobelda and Leda were responsible for bringing the children to Mexico is corroborated by the airline records containing Leda's name and the evidence (also cited in the PSR) that the flights from Houston to Harlingen were confirmed from Leda's telephone number.  The PSR also relied on information obtained from an INS interview of Jose Antonio Guerrero-Funez, who made smuggling arrangements with immigrants in Mexico.  According to the agents, Guerrero-Funez told them that Nobelda and Leda recruited him and directed him in his smuggling activities in Mexico.

23

The foregoing information, indicating that Nobelda and Leda were in charge of supplying children for use in the smuggling operation, that they recruited accomplices, and that they organized others in carrying out the crime, adequately supports the PSRs' findings that they were leaders or organizers. Further, this information, having been derived primarily from the INS's report on its investigation and having been confirmed by Paredes in his testimony at the sentencing hearing, bears sufficient indicia of reliability.[13] Accordingly, in the absence of rebuttal evidence, the district court did not clearly err by adopting the PSRs' findings that Nobelda and Leda were leaders or organizers.

---

[13] Nobelda and Leda have not demonstrated that the information obtained from the INS investigation is untrue or unreliable. Leda cannot meet this burden with her claim that Nobelda's periodic use of Leda's name undermines the evidence that Leda took children to Harlingen or with her more general claim that her role was less significant than that of Nobelda. As we have noted in reviewing a district court's fact findings for sentencing purposes, "[t]he court is free to disregard a defendant's unsworn assertions that the PSR is unreliable." Ayala, 47 F.3d at 690.

Nobelda and Leda also challenge the viability of the leader/organizer finding by pointing out that "[e]ven the PSRs recognize that [Jose Antonio Guerrero-Funez] was the individual who made all the smuggling arrangements with the aliens in Mexico." That does not, however, mean that Nobelda and Leda could not exercise leader/organizer roles by being responsible for supplying children to the immigrants, a key aspect of the conspiracy. The commentary to section 3B1.1 recognizes that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 cmt. n.4 (2000). Moreover, the PSR also states that Guerrero-Funez told INS agents that he was recruited by Nobelda and Leda and that they directed his activities.

## V. THE DENIAL OF AN OFFENSE-LEVEL DECREASE FOR ACCEPTANCE OF RESPONSIBILITY

In their final challenge to their sentences, Nobelda and Leda argue that the district court erroneously adopted the PSRs' findings that they were not entitled to reductions in their offense levels for acceptance of responsibility because they had "minimized" their culpability for the offense. Subsection 3E1.1(a) of the Sentencing Guidelines provides that a defendant's offense level should be decreased by two "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." U.S. SENTENCING GUIDELINES MANUAL § 3E1.1(a) (2000).[14] Following the guidance provided in the commentary to section 3E1.1, this court recognizes that the sentencing court "is in a unique position to evaluate a defendant's acceptance of responsibility" and thus accords "great deference" to the sentencing court's finding on this issue. Id. § 3E1.1 cmt. n.5; see also United States v. Hooten, 942 F.2d 878, 883 (5th Cir. 1991).

---

[14] A defendant whose unreduced offense level is 16 or greater and who has satisfied the "clearly demonstrates" standard of subsection 3E1.1(a) is entitled to an additional decrease of one level (for a total of three) if "the defendant has assisted authorities in the investigation or prosecution of his own misconduct." U.S. SENTENCING GUIDELINES MANUAL § 3E1.1(b) (2000). Nobelda and Leda assert that they are entitled to the full three-level decrease. Because we conclude that the district court did not clearly err in finding that they failed to clearly demonstrate acceptance of responsibility, however, we need not address the applicability of subsection 3E1.1(b).

In an addendum to Nobelda's PSR, the probation officer explained his decision not to recommend a reduction in her offense level for acceptance of responsibility:

> We maintain that [Nobelda] has not demonstrated full responsibility for her actions in this conspiracy, as she emp[h]atically denied being a smuggler and minimized her role by stating that she was "only trying to help out her neighbors."

At the sentencing hearing, the government's attorney did not defend the PSR's recommendation regarding acceptance of responsibility, but rather stated that "[i]t's hard for me to object [to an offense-level decrease for acceptance of responsibility] when the person comes in and pleads guilty to the offense short of trial and then she did debrief." After noting the PSR's conclusion that Nobelda had minimized the seriousness of her actions by stating that she was trying to help her neighbors, the district court asked Nobelda whether she would like to say anything about the acceptance of responsibility issue.[15] Nobelda responded:

> I accepted my responsibility because . . . I accepted the truth because I participated and I helped those people out, but I want it to be clear that at no moment I was caught with anybody, at no moment. . . . [A]t no moment did those people do the deal with me. They paid her ("the lady with the children") but at no moment did they pay me.

The court then overruled Nobelda's objection and adopted the PSR's finding that she had not accepted responsibility to the

---

[15] Both Nobelda and Leda communicated with the district court through translators.

extent necessary to warrant an offense-level decrease under section 3E1.1.

Turning to Leda's objection, the district court pointed to her written statement offered to demonstrate acceptance of responsibility, which the probation officer had deemed insufficient:

> I am writing this statement so that I can attempt to express how I badly feel for my actions in committing the offense. . . . I knew that my sister, Nobelda Cabrera, was involved in helping aliens illegally enter the United States. She would do this by arranging for small children to accompany the aliens as they crossed the border. I am not sure of the exact details and I don't know how many times she did this. But I admit that I helped her on some occasions by —— among other things —— taking telephone messages regarding the smuggling, and picking up money that was paid because of the smuggling. I realize that I assisted her and contributed to her illegal conduct.

The probation officer determined that this statement minimized Leda's role "by directing the aggravating role to Nobelda." Leda made a similar statement at the sentencing hearing when the district court gave her the opportunity to speak about her acceptance of responsibility:

> I accept my responsibility. And I am asking you and all the authorities for forgiveness. I accept that I took messages for my sister. I accept that I knew . . . what she was doing. But I don't have so much to do with this thing because many times I talked with her and she never gave me the specific explanation.

The district court also overruled Leda's objection and adopted the PSR's finding that she was not entitled to an offense-level decrease for acceptance of responsibility.

Pointing to the commentary to section 3E1.1, Nobelda and Leda argue that the district court erroneously denied them acceptance-of-responsibility reductions because they "timely admitted the conduct comprising the offense of conviction and ha[ve] not falsely denied the additional relevant conduct for which [they are] accountable." Nobelda and Leda are correct that it is appropriate for the district court to consider whether a defendant has "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admitt[ed] or not falsely den[ied] any additional relevant conduct" "[i]n determining whether a defendant qualifies under subsection [3E1.1](a)." U.S. Sentencing Guidelines Manual § 3E1.1 cmt. n.1(a) (2000). While the commentary accords particular importance to this consideration by deeming it "significant evidence" of acceptance of responsibility if accompanied by a timely guilty plea, see id. § 3E1.1 cmt. n.3,[16] it is only one of the considerations that the commentary deems appropriate, and the commentary specifies that its list of appropriate considerations is not exhaustive, see id. § 3E1.1 cmt. n.1.

---

[16] The commentary states:
Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct . . . will constitute significant evidence of acceptance of responsibility for purposes of subsection [3E1.1](a).
U.S. Sentencing Guidelines Manual § 3E1.1 cmt. n.3 (2000).

28

Particularly in light of the great deference that we owe the district court's acceptance-of-responsibility findings, we cannot say that it was clear error to conclude that Nobelda and Leda's statements minimized their conduct to the extent that they were not completely truthful or that Nobelda and Leda falsely denied some of their relevant conduct. Moreover, even assuming Nobelda and Leda's statements were truthful and did not falsely deny their offense conduct, it would not have been clear error for the district to conclude that their minimization of their conduct outweighed this "significant evidence" of acceptance of responsibility. Nobelda and Leda "bear[] the burden of demonstrating the recognition and affirmative acceptance of personal responsibility." Ayala, 47 F.3d at 690. Given that Nobelda and Leda's statements were somewhat equivocal and that the district court is particularly well-situated to ascertain whether defendants have demonstrated acceptance of responsibility, the district court's conclusion that Nobelda and Leda failed to meet this burden is not clearly erroneous.

## VI. CONCLUSION

Because we conclude that the district court did not clearly err in finding that (1) the offense involved the smuggling of twenty-nine immigrants, (2) Nobelda and Leda were leaders or organizers, and (3) they had not accepted responsibility for

29

their conduct in the offense, we AFFIRM Nobelda and Leda

Cabrera's sentences.