United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 10, 2006**

Charles R. Fulbruge III
Clerk

*In the United States Court of Appeals*
*for the Fifth Circuit*

No. 05-10447

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

DANIEL T. ROSE,

        Defendant - Appellant.

Appeal from the United States District Court
for the Northern District of Texas
No. 3:03-CR-00189-ALL

Before GARWOOD, BENAVIDES, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Following a jury trial, Daniel Rose was convicted of conspiring to "suppress and eliminate competition by fixing the price, rigging bids, and allocating customers for choline chloride sold in the United States[,]" in violation of section 1 of the Sherman Act.[1] Rose appeals his conviction, asserting insufficiency of the evidence, and challenges his sentence based on the district court's findings regarding the volume of commerce affected by the offense and Rose's alleged role as a manager or supervisor. Because the evidence is

---

[1] 15 U.S.C. § 1.

sufficient to support the jury's verdict, we AFFIRM Rose's conviction. However, we VACATE Rose's sentence and REMAND for resentencing.

## I

Daniel Rose became president of DuCoa, L.P. in August 1997. DuCoa manufactured choline chloride, a B complex vitamin essential for the proper growth and development of animals. At that time, DuCoa and two of its competitors, Bioproducts, Inc., and Chinook Group Limited, were responsible for more than 90% of choline chloride sales in the United States. The Department of Justice began a grand jury investigation into price-fixing of bulk vitamins, and officers of Bioproducts eventually approached the Department of Justice and exposed a price-fixing conspiracy involving choline chloride. Five current and former officers of DuCoa and Chinook pleaded guilty. DuCoa itself pleaded guilty.

Rose was indicted for conspiracy to violate section 1 of the Sherman Act, and the charge against him proceeded to trial. A mistrial was declared when the jury was unable to agree on a verdict, but upon retrial, the jury returned a verdict adverse to Rose. The district court sentenced Rose to 30 months imprisonment, one year of supervised release, and a $20,000 fine, adopting the following findings and recommendations in the Presentence Report: (1) a one-level enhancement for bid-rigging, pursuant to U.S.S.G. § 2R1.1(b)(1); (2) a five-level enhancement for affecting a volume of commerce of over $15 million, which included the commerce affected from August 1997 through September 1998, pursuant to U.S.S.G. § 2R1.1(b)(2)(E); and (3) a three-level enhancement for Rose's role in the offense as a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b).

2

In this appeal, Rose contends: (1) the evidence is insufficient to support his conviction; (2) the district court clearly erred by finding that he was a manager or supervisor; and (3) the district court clearly erred by holding him responsible for the volume of commerce affected before February 1998.

**II**

We begin by reviewing Rose's conviction. When the defendant moves for judgment of acquittal at the close of the evidence, as Rose did here, we decide whether the evidence is sufficient by "viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict" and determining whether "a rational jury could have found the essential elements of the offense[] beyond a reasonable doubt."[2] The jury has the sole responsibility for weighing the evidence and making credibility determinations.[3] "It is not necessary that the evidence exclude every rational hypothesis of innocence or be wholly inconsistent with every conclusion except guilt, provided a reasonable trier of fact could find the evidence establishes guilt beyond a reasonable doubt."[4] "However, we must reverse a conviction if the evidence construed in favor of the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged."[5]

---

[2]*United States v. Pruneda-Gonzalez*, 953 F.2d 190, 193 (5th Cir. 1992).

[3]*United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995).

[4]*Pruneda-Gonzalez*, 953 F.2d at 193.

[5]*Jaramillo*, 42 F.3d at 923 (internal quotations and citations omitted); *see also United States v. Gonzales*, 436 F.3d 560, 571 (5th Cir. 2006).

3

Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce among the several States . . . ."[6] "[C]onspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."[7] Moreover, conspiracies to "submit collusive, noncompetitive, rigged bids,"[8] allocate customers,[9] and fix prices are *per se* violations of the Sherman Act.[10] To show that Rose actually intended to enter into the conspiracy, "the government was required to show that [he] knowingly joined or participated in [it]."[11]

Viewing the evidence in the light most favorable to the verdict, the conspiracy was conceived and formed by at least 1989, when the market for choline chloride was roughly divided evenly between DuCoa, Bioproducts and Chinook. The three companies entered into an agreement to keep their respective shares of the market at one-third through price fixing, customer allocation, and bid rigging. Specifically, the companies agreed to fix the list price for choline chloride, which was the price announced in various trade journals and used as a reference point in determining the price for particular customers. The companies allocated

---

[6]15 U.S.C. § 1.

[7]*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

[8]*United States v. Young Bros., Inc.*, 728 F.2d 682, 687 (5th Cir. 1984) (internal quotations and citations omitted).

[9]*United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1090 (5th Cir. 1978).

[10]*See, e.g., Socony-Vacuum Oil Co.*, 310 U.S. at 218 ("[P]rice-fixing agreements are unlawful per se under the Sherman Act . . . .").

[11]*Young Bros., Inc.*, 728 F.2d at 687.

customers by deciding which company would offer the lowest price for choline chloride to a particular customer at the next bidding opportunity. This agreement was aimed at stabilizing the market and keeping the price of choline chloride higher than it would otherwise be.

From time to time, the companies disregarded the agreement by engaging in competitive activity, for example, attracting another's customers by offering a lower price. At the time Rose became the president of DuCoa in August 1997, there had been increased disregard of the market-sharing and pricing agreement and decreased communication among the conspirators. The former president of DuCoa, Lindell Hilling, testified that he nevertheless viewed the agreement to be in effect at that time. Hilling had been president of DuCoa since 1987 and was actively involved in the conspiracy. He testified that, before Rose succeeded him, he met with Rose to explain the business to him. Hilling believed he was openly discussing the conspiracy with Rose, although he did not use terms such as "conspiracy," "bid rigging," or "allocating customers." Hilling had prepared handwritten notes prior to the meeting to guide the discussion, and they included phrases such as "Settle Market Share Issues." He gave a copy to Rose to use during their conference. The phrase "Between Competitors" was written by Rose on those notes during the meeting.

Pete Fischer—Rose's subordinate and the president of DuCoa's basic products division, including choline chloride—had joined the conspiracy by 1992. Like Hilling, Fischer believed the agreement was still in effect when Rose became president, despite the increase in competitive activity among the conspirators. Fischer testified that he discussed

5

the agreement with Rose in the latter part of September 1997 when the two were on a business trip in Europe. Fischer testified that he and Rose discussed the recent instability of the market. Fischer felt that Rose needed to know about the agreement so that they could develop a strategy "to manage the market going forward." According to Fischer, once the two returned from Europe, they developed a strategy "to draw a line in the sand" and "show that [DuCoa was] still dealing from a position of strength" by taking a major account, Tyson Foods, from Bioproducts. Fischer said the "intent[] was to bring [Bioproducts] . . . back to the table to reallocate product to [bring] the market back into equilibrium[,] so that prices could be stabilized and margins increased."

Subsequently, the plan was effectuated when a company that DuCoa supplied, South Central Products, underbid Bioproducts and acquired a contract to supply Tyson Foods with half of its needs for choline chloride. Chinook supplied the other half. Following this development, two Chinook executives, John Kennedy and Robert Samuelson, met with Thomas Sigler of Bioproducts, and with Fischer, Rose, and Antonio Felix from DuCoa, in Atlanta, Georgia in January 1998 during the Southeastern Poultry Convention to discuss the situation. At the meeting, which was held off-site at a small café to avoid arousing suspicion, Rose was introduced to the competitors, and Sigler demanded that DuCoa return the Tyson account. DuCoa refused. No agreements were reached during this meeting.

Fischer arranged for another meeting to be held the following month, in February 1998. To prepare, he and Felix, a DuCoa vice president, "put together particular accounts that [they] felt could be moved over to [Bioproducts] and/or Chinook, if necessary, to

reallocate the additional volume[] that [DuCoa] picked up at Tyson." Fischer and Felix discussed these accounts with Rose. The competitors, including Rose, then met at the Hilton Hotel at Chicago's O'Hare airport. They began the gathering by discussing the size of the choline chloride market in the United States and then determined "who was long on volume and who was short on volume . . . [to] determine a path forward to bring that volume back into equilibrium." Felix and Kennedy testified that Chinook agreed to give one of its accounts, Cagle's, to Bioproducts to make up for the loss of Tyson and equalize shares between the competitors. DuCoa also agreed that its customer Roche "would be moved to [Bioproducts]." The competitors further agreed to raise prices effective April 1, 1998 and how that would be announced in a trade publication and letters to customers. Felix, from DuCoa, had prepared a price proposal for the group to consider, but "it was decided to . . . go with higher prices than the ones proposed by DuCoa." Rose actively participated in the conference, and according to Felix, was "leading the meeting" for DuCoa and "was the voice for DuCoa."

A month after the February meeting, in March 1998, DuCoa, represented by Rose, Fischer, and Felix, met with Bioproducts, represented by Sigler, at the St. Louis airport. Chinook was not present. According to Fischer, the purpose of this meeting was to "feel [Sigler] out in terms of whether or not he was still going to support the price increase in April, and to try to see if there were some potential ways [they] could work together." Sigler confirmed that it had put the price increase in place, and DuCoa and Bioproducts shared the prices they intended to offer to some of their respective customers. Sigler also wanted Tyson

restored as a customer, but Rose refused and pointed out that Cagle's was a good compromise. Sigler relented and complied with this plan by subsequently refraining from submitting a competitive bid to Tyson. Sigler admitted, "We were bidding not to win." Rose was an active participant in the St. Louis meeting.

The competitors did not meet face-to-face after that March meeting, but did confer by phone. However, in June 1998, Sigler was confronted by others at Bioproducts regarding his role in the conspiracy, and it was then that Bioproducts approached and sought leniency from the Department of Justice. Rose and Kennedy were unaware of this development, but were aware that Bioproducts became more aggressive in the marketplace during and after July. Rose and Kennedy continued to communicate and attempted, unsuccessfully, to contact Sigler. Rose and Kennedy planned to meet at the end of September 1998, but cancelled this plan after the FBI executed search warrants on DuCoa's and Chinook's offices. Felix, Fischer, and Kennedy ultimately pled guilty to a conspiracy to violate section one of the Sherman Act, and Sigler was not prosecuted.

Rose contends that although a conspiracy existed before he became president of DuCoa, it no longer existed at the time he assumed that position because of the competitors' excessive disregard of the agreement and lack of communication. However, Fischer testified that although the agreement was "strained," it was "still in place" when Rose became president, and this was corroborated by Sigler and Kennedy of Bioproducts and Chinook.

Rose asserts that DuCoa's successful competition for the Tyson account, through South Central Products, evidences DuCoa's withdrawal from the alleged conspiracy. Rose's

8

counsel pressed the same argument at trial. A jury is free to choose among reasonable interpretations of evidence,[12] and there was evidence that bidding to win the Tyson account was intended to strengthen DuCoa's position in enforcing the conspirators' agreement. In any event, there is substantial evidence of a conspiracy to fix prices and allocate customers during Rose's tenure and of his knowledge of and participation in that conspiracy. The evidence presented at trial was sufficient to support the jury's verdict that Rose conspired to restrain trade in violation of the Sherman Act at some time during the period alleged in the indictment.[13]

## III

Rose next challenges the district court's three-level enhancement to his sentence for his alleged role as a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b). At the sentencing hearing, the district court concluded that the PSR's findings regarding Rose's role in the offense were "correct under a preponderance of the evidence standard" and overruled Rose's objection to the enhancement. "We review the trial court's determination that [Rose] was a manager or supervisor under a clearly erroneous standard."[14] The court "will deem the

---

[12]*United States v. Young Bros., Inc.*, 728 F.2d 682, 687 (5th Cir. 1984).

[13]*See Russell v. United States*, 429 F.2d 237, 238 (5th Cir. 1970) ("It seems well settled that an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.") (internal quotations and citations omitted).

[14]*United States v. Liu*, 960 F.2d 449, 456 (5th Cir. 1992); *see also United States v. Villanueva*, 408 F.3d 193, 203 n.9 (5th Cir. 2005) ("Post-*Booker*, we continue to apply the same standard of review to claims of erroneous fact-finding . . . .").

district court's factual findings clearly erroneous only if, based on the entire evidence, [the court is] left with the definite and firm conviction that a mistake has been committed."[15] "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[16] "[A] district court may adopt the facts contained in a PSR without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable."[17]

Having reviewed the record in its entirety, we are not "left with the definite and firm conviction that a mistake has been committed."[18] Section 3B1.1(b) authorizes a three-level increase to the defendant's offense level if the "defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive . . . ."[19] The commentary to Section 3B1.1(b) provides that even if a defendant was not a manager or supervisor, the enhancement may be warranted if the defendant "exercised management responsibility over the property, assets, or activities of a criminal organization."[20] Rose determined whether DuCoa would be part of the conspiracy

---

[15] *United States v. Cabrera*, 288 F.3d 163, 168 (5th Cir. 2002) (internal citations and quotations omitted).

[16] *Villanueva*, 408 F.3d at 203.

[17] *Cabrera*, 288 F.3d at 173-74.

[18] *Id.* at 168.

[19] U.S.S.G. § 3B1.1(b) (2004).

[20] *Id*. cmt. n.2.

once he knew of the agreement to fix prices and allocate customers. Kennedy, an officer of Chinook, testified, "If Dan [Rose] had said . . . he was not going to be part of the agreement, or if he said that we can't discuss this, it was illegal, in my estimation it would have been that [sic] the agreement was over and there would have been – no reason to have any discussions." The evidence reasonably supports the conclusion that Rose, as president of DuCoa, had the authority to decide what bids would be submitted to customers and in fact exercised that control in successfully competing for the Tyson account. At a minimum, Rose "exercised management responsibility over the property, assets, or activities of a criminal organization."[21]

Rose emphasizes that he never recruited anyone into the conspiracy and that, in fact, Fischer and the other conspirators, who had been involved in the conspiracy for years before Rose became president of DuCoa, recruited, or attempted to recruit, him. A defendant's recruitment of accomplices is just one of several factors considered by a court in determining whether a leadership enhancement is appropriate.[22] Although Rose did not recruit others into the conspiracy, the trial testimony demonstrates that he spoke for DuCoa at the meetings, exercised supervisory control over Fischer and Felix, and made decisions for DuCoa. The district court did not clearly err by adopting the findings and recommendation in the PSR to apply the three-level manager enhancement.

---

[21]*Id.*

[22]*See id.* cmt. n.4 (2004) (listing the factors); *United States v. Pofahl*, 990 F.2d 1456, 1480 n.27 (5th Cir.1993).

# IV

Finally, Rose argues that the district court clearly erred by adopting the PSR's finding that Rose affected a volume of commerce in excess of $15 million, which resulted in a five-level enhancement pursuant to U.S.S.G. § 2R1.1(b)(2)(E).[23] Specifically, the PSR states that "[t]he volume of commerce attributed to the defendant is approximately $16,115,785.36[,]" which "represents the domestic sales of choline chloride products that were affected by the conspiracy during the defendant's involvement, from August 1997 through September 1998." Rose asserts on appeal, as he did at the sentencing hearing, that the evidence shows that his involvement, if any, in the conspiracy began at the meeting in February 1998.

Because Rose disputes the district court's factual finding regarding the date he entered the conspiracy, our review is for clear error.[24] As previously recounted, there is evidence that the conspiracy existed when Rose became president of DuCoa. Similarly, there is at least some evidence that Rose was aware of the conspiracy at that time. Specifically, Hilling testified that he met with Rose a few days before Rose succeeded him and believed he was discussing the conspiracy openly with Rose. However, there is no evidence that Rose knowingly joined or participated in the conspiracy at that time. It was not until the end of September 1997 at the earliest, when, according to Fischer's testimony, Fischer told Rose

---

[23]Section 2R1.1(b)(2)(E) provides for a five-level enhancement for a volume of commerce over $15 million, while section 2R1.1(b)(2)(D) provides for a four-level enhancement if the volume of commerce is over $6.25 million.

[24]*United States v. Cabrera*, 288 F.3d 163, 168 (5th Cir. 2002); *see also United States v. Villanueva*, 408 F.3d 193, 203 n.9 (5th Cir. 2005).

of his involvement in the conspiracy. Rose and Fischer thereafter developed a strategy to strengthen DuCoa's position with its competitors in order to enforce the agreement that had been made in restraint of trade. Even under a liberal reading of the record, there is no evidence that Rose joined the conspiracy in August 1997, as found by the district court, or failed to stop a subordinate that he knew was participating from further participation.

At oral argument, the government asserted that Rose's knowledge of the conspiracy, coupled with his position as president of the company, is enough evidence to show that Rose joined the conspiracy. The government relies on an Eighth Circuit decision, *United States v. Misle Bus & Equipment Co.*, in support of its position.[25] In *Misle Bus*, the court found no error in a jury instruction that the defendant, a company official, could be held liable for participation in a conspiracy if "he was in a position to stop a subordinate who he knew was participating in that conspiracy from further participation, but failed to do so."[26] Assuming, without deciding, that this would be a basis for finding participation in a conspiracy, there is no evidence that Rose knew a subordinate was participating in the conspiracy until he and Fischer discussed the agreement in September 1997. Hilling had departed DuCoa at the time that Rose became its president and was not Rose's subordinate. There is no evidence that Rose knew any of his subordinates were participating in a conspiracy until Fischer told Rose of his role in furthering the agreement. The district court therefore erred by adopting the

[25]967 F.2d 1227, 1236 (8th Cir. 1992).

[26]*Id.*

13

volume of commerce figure in the PSR, which attributed to Rose the commerce affected by the conspiracy from August 1997 to September 1998.

Because Rose objected to this enhancement at sentencing, we must reverse Rose's sentence unless the error was harmless,[27] meaning it "did not affect the district court's selection of the sentence imposed."[28] To qualify for a five-level enhancement under U.S.S.G. § 2R1.1(b)(2)(E), the defendant must be attributed with a volume of commerce in excess of $15 million. The PSR calculated the total volume of commerce between August 1997 and September 1998 at $16,115,785.36. Because the evidence shows that Rose entered the conspiracy, at the earliest, at the end of September 1997, the volume of commerce attributable to him may very well fall below $15 million, in which case, the district court could have only applied a four-level enhancement. Such an enhancement would yield an offense level of 18 and a sentencing range of 27 to 33 months.[29] Although Rose's sentence of 30 months would still fall within the applicable sentencing range, we cannot say that the district court's error had no effect on Rose's sentence.[30]

---

[27]See FED. R. CRIM. P. 52(a); *United States v. Sanders*, 343 F.3d 511, 528 (5th Cir. 2003) (vacating sentence after concluding that district court clearly erred and the error was not harmless).

[28]*United States v. Ahmed*, 324 F.3d 368, 374 (5th Cir. 2003) (internal citation and quotation marks omitted).

[29]See U.S.S.G. Ch. 5, pt. A (Sentencing Table) (2004).

[30]See *Ahmed*, 324 F.3d at 374 (declining to find harmless error even though the sentence fell within both sentencing ranges).

\* \* \* \* \*

For the foregoing reasons, we AFFIRM Rose's conviction, VACATE his sentence, and REMAND for resentencing in accordance with this opinion.