United States Court of Appeals
Fifth Circuit

**F I L E D**

April 27, 2005

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-20812

UNITED STATES

Plaintiff-Appellee

versus

CESAR AUGUSTO VILLANUEVA; DIMAS ALEXANDER CORTEZ-LUMAS; JOSE
ENCARNACION REYES

Defendants-Appellants

--------------------
Appeal from the United States District Court
for the Southern District of Texas, Houston
4:02-CR-278-3
--------------------

Before HIGGINBOTHAM, SMITH and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

We are presented with a case of conspiracy to smuggle undocumented aliens for commercial gain and attempts to aid and abet the smuggling of undocumented aliens to the United States for commercial gain. This appeal requires us to determine for the first time in this circuit whether 8 U.S.C. § 1324(a)(2)(B)(ii) can support a conviction for conduct occurring outside the United States. We hold that it can and rejecting other arguments raised by appellants we Affirm.

**I.**

1

Defendants-Appellants Cesar Augusto Villanueva ("Villanueva"), Dimas Alexander Cortez-Lumas ("Cortez-Lumas"), and Jose Encarnacion Reyes ("Reyes") were found guilty, after a jury trial, of conspiracy to bring undocumented aliens to the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(2)(B)(ii) ("count one"), and of two counts of aiding and abetting an attempt to bring two individual undocumented aliens to the United States in violation of 18 U.S.C. § 2 and 8 U.S.C. § 1324(a)(2)(B)(ii). Two co-conspirators, Jose Jairo Enriquez-Amaya ("Enriquez-Amaya") and Wilfredo Gonzalez-Rodriguez ("Gonzalez-Rodriguez"), pled guilty to count one.

Defendants-appellants appeal their convictions and their sentences. For the reasons set forth below, we affirm the judgment of the district court in all respects.

**II.**

At trial, the government presented the testimony of five primary witnesses: Ana Hernandez-Alvarado ("Hernandez-Alvarado") and Doris Elizabeth Cedillo ("Cedillo"), who were two of the approximately 140 immigrants attempting to enter the United States; Lieutenant Romeo Margarin ("Margarin"), who is a police officer in El Salvador and who searched Reyes' house in El Salvador; Enriquez-Amaya, who pled guilty as a co-conspirator; and Carlos Archuleta ("Archuleta"), a senior special agent with the U.S. Department of Homeland Security.

Hernandez-Alvarado and Cedillo described the circumstances

2

surrounding their attempt to immigrate to the U.S. from El Salvador.  The process began when they each paid $1,500 to Reyes' wife, Judith Bonilla, as a smuggler's fee.  Reyes then led Hernandez-Alvarado and a group of about 20 immigrants to the El Salvador-Guatemala border.  Villanueva and Cortez-Lumas were guides who met the group at the El Salvador-Guatemala border and the Guatemala-Mexico border, respectively.  As the group moved through Guatemala and Mexico, Hernandez-Alvarado witnessed Villanueva, Cortez-Lumas, and two other guides giving orders to groups of immigrants, obtaining and distributing food to the immigrants, and otherwise leading the then-150-person party.

In Mexico, the guides loaded the immigrants into a large "Thermal King" trailer pulled by a tractor.  Villanueva, Cortez-Lumas, Enriquez-Amaya, and Wilfredo Gonzalez-Rodriguez also traveled inside of the trailer.  The trailer lacked adequate ventilation, and at one point Enriquez-Amaya and Gonzalez-Rodriguez used an ax to cut a hole in the top of the trailer. Mexican police stopped the tractor-trailer on the outskirts of Monterrey on January 25, 2002 and placed everyone under arrest. The northbound journey of the would be illegal immigrants was thus concluded before they reached the United States border.

Lieutenant Margarin, of the National Police Force of El Salvador, found a receipt for approximately $15,000 that Reyes had written out to a well-known immigrant trafficker in El Salvador.  He also found several notebooks containing names and

3

figures.  Special Agent Archuleta testified that one of these notebooks had a "pollo"[1] list with several hundred names of aliens who had been smuggled or were to be smuggled.  On a page dated January 15, 2002, Archuleta found entries for Hernandez-Alvarado and Cedillo.  Archuleta was unable to locate the name Cesar Augusto Villanueva, Dimas Alexander Cortez-Lumas, or Jose Encarnacion Reyes listed anywhere in the notebooks.

Enriquez-Amaya identified Jose Narcisso Ramirez-Ventura as the overall leader of the smuggling organization and Cortez-Lumas as the person in charge of coordinating this particular trip.  Enriquez-Amaya identified Villanueva as his immediate superior on the trip, and he testified that Villanueva led a group of 20-25 immigrants.  Additionally, Enriquez-Amaya testified that Villanueva and another guide told him that they worked for Reyes.

Soon after intercepting the tractor trailer, Mexican authorities released and repatriated 144 of the aliens.  Although U.S. funds paid for the repatriations, Archuleta was not involved in the decision and he was not aware of it until after it occurred.  Mexican authorities tried and convicted the driver and co-driver of the trailer, and held Villanueva, Cortez-Lumas, Enriquez-Amaya, and Gonzalez-Rodriguez, who had been identified by many of the aliens as guides.

However, a court in Mexico later ordered the release of the

_____

[1] "Pollo" is a Spanish word for a chicken and is commonly used by alien smugglers to describe their human cargo.

4

four men charged as guides.  It was at this point that Archuleta

initiated a prosecution of the four men by U.S. authorities.

**III.**

We first consider defendants-appellants' challenges to their

convictions.

A.

Appellants first argue that the district court erred by

finding that Congress intended 8 U.S.C. § 1324(a) to apply to

extraterritorial conduct.[2]

"It is a longstanding principle of American law 'that

legislation of Congress, unless a contrary intent appears, is

meant to apply only within the territorial jurisdiction of the

United States.'" *Smith v. United States*, 507 U.S. 197, 204 (1993)

(quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991)).

Several recent Supreme Court decisions reinforce this

presumption.  *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509

U.S. 155, 176 (1993) (there must be affirmative evidence that

Congress intended extraterritorial application); *F. Hoffman-La

Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 124 S.Ct. 2359, 2366

(2004) (the Supreme Court "ordinarily construes ambiguous

statutes to avoid unreasonable interference with the sovereign

---

[2] Appellants were convicted of conspiracy, in violation of
18 U.S.C. § 371.  However, it is the underlying substantive crime
of attempting to bring aliens to the United States for the
purpose of commercial advantage or private financial gain that is
relevant in determining subject matter jurisdiction.  *See, e.g.*,
*United States v. Baker*, 609 F.2d 134, 139 (5th Cir. 1980).

authority of other nations"). Thus, the crux of this issue is whether Congress intended 8 U.S.C. § 1324(a)(2)(B)(ii) to apply to extraterritorial conduct.

Such intent can be inferred when limiting the locus of a statute to U.S. territory would greatly curtail the scope and usefulness of the statute and leave open a large immunity for frauds that are as easily committed by citizens extraterritorially as at home. *United States v. Bowman*, 260 U.S. 94, 98 (1922).

1. The language of the statute, the legislative history, and the nature of the law indicate that Congress intended § 1324(a) to apply to extraterritorial conduct.

The language of the statute itself indicates that Congress intended it to apply to extraterritorial conduct.[3] First, the statute uses the phrase "brings to . . . the United States," rather than "brings into . . . the United States." In 1986, Congress enacted the Immigration Reform and Control Act, which completely overhauled § 1324(a), including a change from the

---

[3] 8 U.S.C. § 1324(a)(2)(B)(ii) provides:

> (2) Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs – . . . (B) in the case of – . . . (ii) an offense done for the purpose of commercial advantage or private financial gain . . . be fined under Title 18, and shall be imprisoned . . . .

6

phrase "brings into" to the phrase "brings to."[4]  The legislative history indicates that Congress made the change in response to the decision in *United States v. Anaya*, 509 F. Supp. 289, (S.D. Fla. 1980)(en banc) (aff'd on other grounds, *sub nom. United States v. Zayas-Morales*, 685 F.2d 1272 (11th Cir. 1982)); H.R. Rep. No. 682(I), 99th Cong., 2d Sess. 65-66 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5669-70.  In *Anaya*, the court held that "brings into" is synonymous with "entering," so that a transporter of illegal immigrants could not be guilty if the immigrants he transported were not allowed entry into the United States.  509 F.Supp. at 297.  In response, Congress expanded the scope of § 1324(a) by, *inter alia*, changing the phrase "brings into" to "brings to" in order to "deter potential transporters from inundating U.S. ports of entry with undocumented aliens." H.R. Rep. No. 682(I) at 66.  Such an alteration strongly suggests that Congress intended extraterritorial application because it shows that Congress was concerned about activity taking place outside of the United States.

Second, the statute criminalizes attempts.  While some

---

[4]The pre-1986 version of 8 U.S.C. § 1324(a) provided:

Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who (1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise . . . any alien . . . shall be guilty of a felony . . . .

failed attempts will include activity within the United States, many, if not most, will take place extraterritorially. This is especially true because of the 1986 amendment to § 1324(a), which expanded the scope of § 1324(a) to include attempts to "bring to" to the United States. A failed attempt to "enter" the United States could include an attempt that was foiled after the immigrant had entered U.S. territory.[5] However, a failed attempt to "bring to" the United States, at least when by land, will ordinarily be stopped outside of U.S. territory.

Third, the context of immigration statutes make it natural to expect that Congress intends for them to reach extraterritorial conduct. *See United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980)(Congressional intent for a statute to apply extraterritorially "may be inferred from the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved" when there is no express intention on the face of the statute.). Immigration statutes, by their very nature, pertain to activity at or near international borders. It is natural to expect that Congress intends for laws that regulate

---

[5] As the Ninth Circuit explained in *United States v. Gonzalez-Torres*, federal courts have recognized since 1908 that "entering" the United States requires more than mere physical presence within the country. 309 F.3d 594, 598 (9th Cir. 2002). "To 'enter,' an alien must cross the United States border free from official restraint." *Id*. "Official restraint" may take the form of surveillance that is unbeknownst to the alien, because although the alien has crossed the border, he does not have the freedom to go at large and mix with the population. *Id*. (internal citations omitted).

8

conduct that occurs near international borders to apply to some activity that takes place on the foreign side of those borders.

### 2. Decisions of this Court analyzing drug smuggling laws support a finding that Congress intended 8 U.S.C. § 1324(a)(2)(B)(ii) to apply to extraterritorial conduct.

In the context of drug smuggling laws, this Court has found the necessary congressional intent to overcome the presumption against extraterritorial application in laws that are similar to § 1324(a). In *United States v. Baker*, the defendants were arrested on an American flag vessel in international waters, but within the twelve-mile "customs waters" area, for possession of 51,280 pounds of marijuana. 609 F.2d 134, 135 (5th Cir. 1980). We held that "so long as it is clear that the intended distribution would occur within the United States . . . jurisdiction may be maintained, where defendants are apprehended outside the territorial waters, and inside the contiguous zone." *Id*. at 139.

In a similar case decided just three weeks later, we again found that an anti-drug smuggling law had extraterritorial application. *United States v. Perez-Herrera*, 610 F.2d 289 (5th Cir. 1980). In *Perez-Herrera*, the defendants, who were all American citizens, were arrested aboard an American-registered ship in international waters approximately seventy miles from the United States. *Id*. We determined that "Congress intended that the prohibition of attempts to import drugs should apply to attempts made wholly outside of our borders." *Id*. at 291. We

9

based this conclusion on legislative history and "practical considerations related to the operation of the statute." *Id.* Specifically, we were concerned about setting up a "free-zone" where smugglers could safely await opportunities to move contraband into U.S. territory. *Id.* at 292.

In *Perez-Herrera*, we also determined that the attempt to smuggle marijuana into the U.S. had "real and significant effects" within this country, even without any criminal activity in the U.S., because each smuggling attempt further burdens U.S. enforcement agencies. *Id.*

The instant case is analogous to *Baker* and *Perez-Herrera* in several important respects: the intended destination was the United States; a finding against extraterritorial application could create a "free zone" just beyond the border; and attempts that take place wholly outside of U.S. territory burden U.S. enforcement agencies.

Therefore, for the foregoing reasons, we find that § 1324(a) applies to extraterritorial conduct.[6]

B.

Defendants-appellants next contend that the government denied their Sixth Amendment right to compulsory process, and their Fifth Amendment due process rights, by repatriating

---

[6] This conclusion comports with the conclusion reached by our sister circuit in *United States v. Delgado-Garcia*, 374 F.3d 1337, 1343-44 (D.C. Cir. 2004)(rehearing en banc denied)(holding that § 1324(a) applied to extraterritorial conduct).

approximately 140 witnesses to their native countries before defense counsel could interview them.

1. Standard of Review

We review constitutional claims *de novo*. *United States v. Romero-Cruz*, 201 F.3d 374, 377 (5th Cir. 2000). In order to show that the deprivation of witness testimony amounted to a violation of a defendant's Sixth Amendment right to compulsory process "he must make some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (citing *Washington v. Texas*, 388 U.S. 14, 16 (1967)). With respect to a Fifth Amendment due process claim, a defendant must at least demonstrate that the testimony would have been material to his defense. *Id*. at 872.

> Due process guarantees that a criminal defendant will be treated with "that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."

*Id*. (quoting *Lisenba v. California*, 314 U.S. 219, 236 (1941)). Such a denial of fairness on the basis of the deportation of witnesses cannot be shown without "some explanation of how their testimony would have been favorable and material." *Id*. (citing *United States v. Lovasco*, 431 U.S. 783 (1977); *United States v. Marion*, 404 U.S. 307 (1971)). In addition, due process has been violated "only if there is a reasonable likelihood that the

11

testimony could have affected the trier of fact," considering the entire record. *Id*. at 873-74 and 874 n.10.

2. The government did not deny the defendants' Fifth or Sixth Amendment rights to due process by repatriating the witnesses in this case.

To support their argument, defendants-appellants cite witness statements taken by Mexican authorities from the approximately 140 witnesses who were repatriated. Several of the witnesses either identify individuals other than the defendants as collectors of the smuggling fee or as guides, or the witnesses fail to identify one of the defendants as a guide.

This evidence is not sufficient to satisfy the defendants-appellants' burden. The government presented the eyewitness testimony of a co-conspirator and two immigrants, each of whom identified the defendants as guides. The statements from other witnesses cited by defendants-appellants do not negate the testimony of the government's eyewitnesses. The statements, even if accepted by the jury as true, can only prove that other individuals, in addition to these defendants, acted as guides.

Accordingly, we find that the defendants-appellants failed to make a plausible showing that the repatriated witnesses would have provided testimony that was both material and favorable and reasonably likely to influence the jury. Therefore, the defendants-appellants have not demonstrated that the repatriation of the witnesses violated either their Fifth or Sixth Amendment rights.

12

C.

Defendants-appellants next contend that the government violated the Double Jeopardy Clause of the Fifth Amendment by prosecuting them in the United States after charges had been dismissed in a Mexican court. Whether a second prosecution violates the Double Jeopardy Clause is a question of law that we review *de novo*. *United States v. Smith*, 354 F.3d 390, 398 (5th Cir. 2003).

The Double Jeopardy Clause only bars successive prosecutions by the same sovereign. *Heath v. Alabama*, 474 U.S. 82, 88 (1985). In order to overcome the dual sovereignty doctrine, appellants have to establish that the prosecution in Mexico was a sham prosecution.[7] *Bartkus v. Illinois*, 359 U.S. 121, 122-24 (1959). Although United States officials assisted the Mexican government, defendants-appellants presented no evidence that the United States had any ability to control the prosecution, so they have failed to prove that the Mexican prosecution was a sham.

Accordingly, we find that this prosecution did not violate the Double Jeopardy Clause.

D.

Villanueva contends that the evidence presented at trial was

---

[7] We have previously questioned whether the sham prosecution doctrine even exists. *See United States v. Angleton*, 314 F.3d 767, 773-74 (5th Cir. 2002). Because we find that there is no evidence of a sham prosecution in the instant case, we do not need to reach the question of the existence of the doctrine.

insufficient to convict him of aiding and abetting the attempt to bring to the United States Satia Elizabeth Miranda-Alvarado and Doris Elizabeth Diaz-Cedillo, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. Specifically, Villanueva contends that his acts did not unequivocally demonstrate an intention to help these two women enter the United States. Instead, he argues that he intended to drop the women off at safe houses on the Mexican side of the border, and the women would later enter the United States on their own.

Our standard of review for assessing a challenge to the sufficiency of the evidence is whether, considering all the evidence in the light most favorable to the verdict, a rational trier of fact could have found that the evidence established the elements of the offense beyond a reasonable doubt.[8] *United States v. Peters*, 283 F.3d 300, 307 (5th Cir. 2002).

To aid and abet under § 2, a defendant must associate with the criminal venture, participate in it and seek by his actions to make the venture succeed. *Id*. at 308.

The government proved each of the elements of the offense by

---

[8] The parties agree that 8 U.S.C. § 1324(a)(2)(B)(ii) has five elements: the government must prove that each defendant (1) brought or attempted to bring an alien into the United States; (2) knew the person was an alien; (3) either knew or acted in reckless disregard of the fact that the alien had not received prior official authorization to come to, enter, or reside in the United States; (4) intended to commit a criminal act by bringing or attempting to bring an alien to the United States; and (5) committed the offense for commercial advantage or private financial gain.

14

presenting the eyewitness testimony of Cedillo, Hernandez-Alvarado, and Enriquez-Amaya. All three witnesses identified Villanueva as a guide who helped Cedillo and Hernandez-Alvarado in their effort to enter the United States illegally. Additionally, Special Agent Archuleta testified that Villanueva's name was absent from the "pollo" list that he found in Reyes' home in El Salvador. At the very least, the evidence demonstrated that Villanueva associated with the criminal venture, that he participated in it by acting as a guide, and that he sought to make the venture succeed by aiding immigrants as they traveled from El Salvador to Mexico on the way to the United States. Villanueva knew that the ultimate goal was to illegally enter the United States, and he actively aided that goal.

Viewing this evidence in the light most favorable to the verdict, we find that the evidence was sufficient to convict Villanueva of aiding and abetting the attempt to bring Cedillo and Alvarado to the United States in violation of 8 U.S.C. § 1324(a)(2)(B)(ii).

For the reasons set forth above, we affirm the convictions of Villanueva, Cortez-Lumas, and Reyes.

## IV.

Appellants also challenge various aspects of their sentences. In light of the Supreme Court's decisions in *Blakely* and *Booker*, we have reconsidered the process by which we review a

15

judge's sentencing decisions.  *United States v. Mares*, ___ F.3d ___, ___, 2005 WL 503715 (5th Cir.); *Blakely v. Washington*, 124 S. Ct. 2531, 159 L. Ed. 2d 403, 2004 U.S. LEXIS 4573 (2004); *United States v. Booker*, 125 S. Ct. 738, 160 L. Ed. 621, 2005 U.S. LEXIS 628 (2005).

After *Booker*, when a district court has imposed a sentence under the United States Sentencing Guidelines (the "Guidelines"), we continue to review its interpretation and application of the Guidelines *de novo*.  *United States v. Villegas*, ___ F.3d ___, ___, 2005 WL 627963 at *3-4 (5th Cir.).

A.

Villanueva contends, for the first time on appeal, that the Guidelines are unconstitutional.  For an appellant, such as Villanueva, who raised the issue of the constitutionality of the mandatory Guidelines for the first time on appeal, we review his claim for plain error.  *Mares*, 2005 WL 503715 at *7.

This Court finds plain error when: (1) there was an error; (2) the error was clear and obvious; and (3) the error affected the defendant's substantial rights.  *United States v. Olano*, 507 U.S. 725, 732-37 (1993); *Mares*, 2005 WL 503715 at *8.  "If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Mares*, 2005 WL 503715, at *8 (quoting

16

*United States v. Cotton*, 535 U.S. 625, 631 (2002)).

The first prong of the plain error test is satisfied in this case because Villanueva's sentence was enhanced, under a mandatory Guidelines system, based on findings made by the judge that went beyond the facts admitted by Villanueva or found by the jury. *See Mares*, 2005 WL 503715, at *8. The second prong is also satisfied because, after *Booker*, such error is "plain." *Id*.

Villanueva cannot, however, satisfy the third prong of the plain error test. As we stated in *Mares*, "the pertinent question is whether [Villanueva] demonstrated that the sentencing judge – sentencing under an advisory scheme rather than a mandatory one – would have reached a significantly different result." *Id*. at *9. As in *Mares*, there is no indication in the record in the instant case that gives us any clue as to whether the sentencing judge would have reached a significantly different result. As such, Villanueva cannot carry his burden of proof of demonstrating that the result would have likely been different had the judge been sentencing under the *Booker* advisory regime rather than the pre-*Booker* mandatory regime. Accordingly, we find no plain error.

B.

Villanueva contends that the district court erred in adjusting his sentence, pursuant to U.S.S.G. § 2L1.1(b)(5), for intentionally or recklessly creating a substantial risk of bodily injury to the aliens he transported inside of a Thermal King

17

trailer.  U.S.S.G. § 2L1.1(b)(5) provides for a two-level increase "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person."  Application note six to § 2L1.1 provides several examples of the type of conduct to which (b)(5) applies: "transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition."  U.S.S.G. § 2L1.1 cmt. n. 6.

Villanueva acted as a guide in a conspiracy that involved transporting approximately 140 people in a cramped trailer at highway speeds and with inadequate ventilation.  This is precisely the type of transportation that the application note gives as an example.  The vehicle had substantially more passengers than its rated capacity, and the trailer was crowded and dangerous because of a lack of ventilation and because of the risk of an accident.

Therefore, we affirm the district court's application of the two-level adjustment pursuant to § 2L1.1(b)(5).

C.

Villanueva contends that the district court should have granted a reduction to his sentence pursuant to U.S.S.G. § 3B1.2 for being a minor or minimal participant.  Whether he was a minor or minimal participant is a factual determination that we review

18

for clear error.[9]  *United States v. Mejia-Orosco*, 867 F.2d 216, 221 (5th Cir. 1989).  A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole. *United States v. Valencia*, 44 F.3d 269, 272 (5th Cir. 1995).

The district court held that Villanueva was an average participant despite his minor role in the smuggling network as a whole because he was only held accountable for the criminal activity in which he was personally involved.  The reduction for being a minor or minimal participant remains available for a defendant, like Villanueva, who was only held accountable for the conduct in which he was personally involved.  U.S.S.G. § 3B1.2, cmt. n. 3(A).  However, § 3B1.2 only applies when a defendant is "substantially less culpable than the average participant."  *Id*. It is not enough that a defendant "does less than other participants; in order to qualify as a minor participant, a defendant must have been peripheral to the advancement of the illicit activity."  *United States v. Miranda*, 248 F.3d 434, 446–47 (5th Cir. 2001).

In the instant case, Villanueva acted as a guide in multiple

---

[9] Post-*Booker*, we continue to apply the same standard of review to claims of erroneous fact-finding with respect to the application of adjustments, i.e., we review for clear error. *See United States v. Holmes*, --- F.3d ---,--- 2005 WL 768942, *16 (5th Cir. Apr. 6 2005). *Cf. United States v. Doe*, 398 F.3d 1254, 1257 & n.5 (10th Cir. 2005) ("When reviewing a district court's application of the sentencing Guidelines, we review any factual findings for clear error. . . ."); *United States v. Hazelwood*, 398 F.3d 792, 795, 800-01 (6th Cir. 2005).

countries, over an extended period of time, as the group of immigrants made its way from El Salvador to Mexico. His contribution to the illicit activity was more than peripheral. Thus, the district court's finding that Villanueva was not a minor participant was plausible in light of the record as a whole and we affirm that finding.

D.

Reyes contends that the district court erred in finding that he was a leader and enhancing his sentence pursuant to U.S.S.G. § 3B1.1. The district court's determination that a defendant was a leader or organizer under U.S.S.G. § 3B1.1(a) is a factual finding that we review for clear error. *United States v. Cabrera*, 288 F.3d 163, 173 (5th Cir. 2002).

He argues that the presentence investigation report erroneously attributes some leadership activity to him because of confusion caused by multiple co-conspirators using the nickname "Chico." Even if we were to accept Reyes' contention and ignore the evidence that he identifies, there would still be sufficient evidence to support the district court's finding that Reyes was a leader or an organizer. Among other things, Reyes' house in El Salvador was the assembly point for many of the aliens; his wife collected the initial payments for the smuggling fees for many of the aliens; the "pollo" list for this and other smuggling trips were found in Reyes' house in El Salvador; he recruited and hired the driver of the tractor-trailer, Felipe Torres Escudero; and he

20

was in charge of this particular smuggling expedition. Therefore, even if we accept all of Reyes' assertions, the district court's finding that Reyes was a leader or organizer pursuant to U.S.S.G. § 3B1.1 was plausible in light of the record as a whole and we affirm that finding.

## Conclusion

For the foregoing reasons, the district court's judgment is in all things AFFIRMED.