MOORE, Circuit Judge,
dissenting.
The majority in this case expands the reach of both 19 U.S.C. § 1337 (§ 337) and trade secret law to punish TianRui Group Company Limited (TianRui) for its completely extraterritorial activities. As a court, however, we must act within the confines set out by the text of the law. Here, there is no basis for the extraterritorial application of our laws to punish Tian-Rui’s bad acts in China. As a result, I respectfully dissent.
The majority in this case holds that 19 U.S.C. § 1337(a)(1)(A), which applies to “unfair acts in the importation of articles ... into the United States,” allows the International Trade Commission (Commission) to bar imports because of acts of unfair competition occurring entirely in China. The majority states the issue: “The main issue in this case is whether § 337 authorizes the Commission to apply domestic trade secret law to conduct that occurs in part in a foreign country.” Maj. Op. at 1326. With all due respect, that is not the issue. The issue is whether § 337 authorizes the Commission to apply domestic trade secret laws to conduct which entirely occurs in a foreign country.
The facts of this case are not disputed. A Chinese company, Datong, had a license from a United States company, Amsted, to use in China a process which Amsted kept secret. TianRui, the Chinese company accused of violating § 337 in this case, hired several employees from its Chinese competitor, Datong. These employees disclosed the trade secrets to TianRui in China who used them in China to make railway wheels in China. The acts which arguably constitute misappropriation (theft of a trade secret) all occurred in China.[1]
To be clear, I agree that trade secret misappropriation falls squarely within the terms of § 337: if TianRui carried out its acts of misappropriation in the United States — namely if TianRui came to the United States and stole Amsted’s trade secrets here — then § 337 could be used to bar import of any goods made with the stolen technology. But, as the majority concedes, these are not the facts of this case, and to the extent there was a misappropriation of any Amsted trade secret that misappropriation occurred abroad. Maj. Op. at 1328 n. 1. In this case, none of *1338 the acts which constitute misappropriation occurred in the United States. While TianRui is certainly not a sympathetic litigant — it poached employees to obtain confidential information — none of the unfair acts occurred in the United States and, as such, there is no violation of United States law which amounts to an unfair trade practice under the statute.
United States trade secret law simply does not extend to acts occurring entirely in China. We have no right to police Chinese business practices. Under the majority’s rule today, if the United States government should decide that goods were being produced in a foreign country using what we consider to be unfair business practices, § 337 allows for their exclusion from the United States. The potential breadth of this holding is staggering. Suppose that goods were produced by workers who operate under conditions which would not meet with United States labor laws or workers who were not paid minimum wage or not paid at all — certainly United States industry would be hurt by the importation of goods which can be manufactured at a fraction of the cost abroad because of cheaper or forced labor. Would we consider these business practices unfair? Absent clear intent by Congress to apply the law in an extraterritorial manner, I simply do not believe that we have the right to determine what business practices, conducted entirely abroad, are unfair. According to the majority, its interpretation of § 337 does not give the Commission “the authority ‘to police Chinese business practices’ ”, “[i]t only sets the conditions under which products may be imported into the United States.” Maj. Op. at 1330. This holding could not be clearer' — the Commission cannot police Chinese business practice unless the Chinese wish to import the goods into the United States. The act of importation opens the door to scrutiny of all business practices of the importer associated with the goods including those conducted entirely within China. Section 337 simply does not authorize this level of scrutiny of entirely foreign acts.
I.
Section 337 provides that “[ujnfair methods of competition and unfair acts in the importation of articles ... into the United States” which substantially injure a domestic industry are unlawful. 19 U.S.C. § 1337(a)(1)(A). The unfair act alleged to violate the statute is not the importation of the wheels into the United States. There is nothing inherently unfair about the wheels or the process by which they are imported in this case. Nor is the presence of the wheels in the United States somehow itself an unlawful act — a stark contrast to the illegal immigration cases relied on by the majority where the mere presence of the person in the United States is the unlawful act. The unfair act in this case is the alleged trade secret misappropriation. And both the majority and dissent agree that the conduct related to the misappropriation occurred entirely in China. Any “unfair act” in this case is wholly extraterritorial.
The question is thus whether § 337 contains a clear indication of congressional intent to extend its reach to wholly extraterritorial unfair acts. Analysis of § 337 must be carried out in view of the “longstanding principle of American law ‘that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’” EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (Aramco) (quoting Foley Bros., Inc. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). “Unless there is the affirmative intention *1339 of Congress clearly expressed to give a statute extraterritorial effect, we must presume it is primarily concerned with domestic conditions.” Morrison v. Nat’l Austl. Bank Ltd., — U.S. -, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010) (internal quotations omitted). When applying this principle, “we look to see whether language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control.’ ” Id. (alteration in original) (quoting Foley Bros., 336 U.S. at 285, 69 S.Ct. 575).
I see nothing in the plain language of the statute that indicates that Congress intended it to apply to unfair acts performed entirely abroad. The majority points to no statutory language that expresses the clear intent for it to apply to extraterritorial unfair acts. As a result, this is a simple case: without any indication of a congressional intent to extend § 337’s coverage beyond places over which the United States has sovereignty or has some measure of legislative control, we must limit the reach of the statute to unfair acts in the United States. Cf. id. When the statute is silent as to extraterritorial application, the law is clear: “it has none.” Id. at 2878. Indeed, based on this presumption the Supreme Court has rejected extraterritorial scope for a number of statutes with much stronger textual support than § 337. See, e.g., Small v. United States, 544 U.S. 385, 394, 125 S.Ct. 1752, 161 L.Ed.2d 651 (2005) (“Given the reasons for disfavoring an inference of extraterritorial coverage from a statute’s total silence and our initial assumption against such coverage ... we conclude that the phrase ‘convicted in any court’ refers only to domestic courts, not to foreign courts.”); Morrison, 130 S.Ct. at 2882 (Even broad references to commerce that expressly reference foreign commerce do “not defeat the presumption against extraterritoriality”).
The majority claims that importation “is an inherently international transaction,” and analogizes imports to illegal immigrants, false statements during entry into the United States, the failure to pay an excise tax, and the Economic Espionage Act. Maj. Op. at 1329, 1330 n. 4. In each of those circumstances, however, the courts were confronted either with express statutory language indicating their extraterritorial application, see, e.g., Pasquantino v. United States, 544 U.S. 349, 371-72, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (“the wire fraud statute punishes frauds executed ‘in interstate or foreign commerce’ ” (emphasis added)); Economic Espionage Act, 18 U.S.C. § 1837 (explicitly stating it “also applies to conduct occurring outside the United States”); United States v. Villanueva, 408 F.3d 193, 198 (5th Cir.2005) (explaining that Congress amended the immigration statute to overturn an Eleventh Circuit case which held that the statute did not apply to extraterritorial acts),[2] or the Court held their was no extraterritorial application of the statute at issue, see, e.g., Small, 544 U.S. 385, 125 S.Ct. 1752.
The proper focus to determine whether there is “an affirmative intention of Congress clearly expressed” is the language *1340 of the statute. Section 337 limits the unfair acts to “unfair acts in the importation of articles” into the United States. The majority reads this limitation out of the statute, and claims that Congress “clearly intended to create a remedy for the importation of goods resulting from unfair methods of competition,” Maj. Op. at 1330.
Our predecessor court rejected essentially the same argument nearly eighty years ago, and held that § 337 could not be used to exclude from importation goods produced by a process patented in the United States but carried out abroad. In re Amtorg Trading Corp., 22 CCPA 558, 75 F.2d 826, 834 (1935). In Amtorg, foreign mining companies used processes disclosed and claimed in United States patents abroad, and then shipped the resulting products into the United States. Id. at 831. Even though it would be unfair to use the patented process to produce the same goods within the United States, we explained that this was not an unfair act in the importation of articles since § 337 did not expressly include the authority to apply our laws to acts carried out abroad. Id. at 831-32. In other words, because importing the product into the United States offended no domestic laws,[3] it was not an unfair act in importation and therefore could not be excluded under § 337. Since there is nothing unfair about the importation of the wheels in this case (the appropriate inquiry under § 337) as opposed to their manufacture abroad (which is outside the scope of the plain language of the statute), like Amtorg we must conclude that the wholly extraterritorial trade secret misappropriation is not an unfair act in importation.[4]
After Amtorg, Congress passed an amendment, codified at 19 U.S.C. § 1337a (1940), which allowed the Commission to prevent the “importation ... of a product made ... by means of a process covered by the claims of any unexpired valid United States letters patent.” Section 1337a— unlike § 337 — is a clear indication of Congressional intent that the extraterritorial use of processes claimed in United States patents fall within the scope of unfair acts. See H.R.Rep. No. 1781, 76th Cong., 3d Sess. 4 (1940) (“Since the Amtorg decision owners of American process patent [sic] are helpless to prevent the infringement abroad of their patent rights. This bill will give to them the same rights which the owners of product patents have.”). We must be mindful of the Supreme Court’s clear guidance regarding the limits of extraterritoriality: “when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms.” Morrison, 130 S.Ct. at 2883. Congress could have legislated generally to grant extraterritorial application to any “unfair acts” in § 337, but did not. Congress only changed the statute to create a remedy for *1341 extraterritorial use of process patents.[5] This delicate legislative touch indicates that Congress intended to give special treatment solely to process patents, and not to other categories of “[u]nfair methods of competition and unfair acts in the importation of articles.”
The majority also suggests that the legislative history demonstrates that § 337 should be applied to extraterritorial instances of trade secret misappropriation. Maj. Op. 1330-32. The legislative history, like the plain language of the statute, lacks a dear indication that Congress intended § 337 to apply extraterritorially. The legislative history indicates that Congress intended to give the Tariff Commission (later the International Trade Commission) power to exclude goods when there was an unfair act in importation. For example, it would be unfair for “individuals residing outside the jurisdiction of the United States” to engage in “unfair price cutting, full line forcing, [or] commercial bribery” when importing their products into the United States. U.S. Tariff Comm’s, Sixth Annual Report 4 (1922). Nothing in the cited legislative history suggests that Congress intended to give the Commission the power to punish individuals for bad acts taking place entirely outside of the United States.
The majority’s entire analysis hinges on a single sentence from the U.S. Tariff Commission’s Sixth Annual Report 4 (1922):[6] “These provisions make it possible for the President to prevent unfair practices, even when engaged in by individuals residing outside the jurisdiction of the United States.” There are several problems with the majority’s conclusion. First, this sentence is not even legislative history — the statement was made after the enactment of § 316, a predecessor to § 337. The statement was not made in a Senate Report or House Report or even during any hearing before Congress. It is made in a 99 page annual report that the Tariff Commission sent to Congress as part of its annual reporting requirements. The majority says that this sentence becomes legislative history because Congress did not “disagree with the Commission’s characterization” eight years later when § 316 became § 337 (in the Tariff Act of 1930). Maj. Op. at 1331-32. Even if this sentence was clear on its face, I cannot conclude that this sentence in this report is sufficient to overcome the presumption against extraterritorial application of the statute.
Second, contrary to the majority’s suggestion, the reference to “individuals residing outside the jurisdiction of the United States” in this sentence is not even related to the scope of the acts contemplated. Our predecessor court explained that § 337 was necessary because:
manufactured products, produced in a foreign country where the producer is beyond the control of the courts of the United States, are imported into this country. Up until the time when they are released from customs custody into the commerce of this country, no opportunity is presented to the manufacturer of the United States to protect himself against unfair methods of competition or *1342 unfair acts. After the goods have been so released into the commerce of the country, the American manufacturer may assert his rights against any one who has possession of, or sells, the goods. However, this method of control must be, and is, ineffective, because of the multiplicity of suits which must necessarily be instituted to enforce the rights of the domestic manufacturer. This phase of the matter obviously was in the minds of the Congress at the time of the preparation of said section 337.
In re Orion Co., 22 CCPA 149, 71 F.2d 458, 466-67 (1934). Thus, § 337 was enacted to solve the problem faced by domestic industry when individuals outside the United States imported products which, upon release into the domestic stream of commerce, gave rise to a domestic cause of action. Section 337 provided a means to prevent the unfair act at its source, during the act of importation, thereby avoiding an impossible multiplicity of suits. See id. at 467 (“ ‘The owner of a patent, seeking to protect himself, is confronted with the necessity of proceeding against individual wholesalers or retailers. The resulting multiplicity of suits imposes an impossible burden. Stoppage of importation of infringing articles through an order of exclusion from entry is the only effectual remedy.’ ”). Hence, it is not clear that the single sentence cited by the majority even stands for the proposition that the Commission believed § 316 applied to entirely extraterritorial acts.[7] It certainly does not present clear evidence that Congress did.
In sum, there is no indication in § 337 that Congress intended it to apply to wholly extraterritorial unfair acts. In light of the plain language of the statute, the legislative history, the selective Congressional action to grant extraterritorial effect to process patents, and the contrast to other extraterritorial statutes, I conclude § 337 does not reach the misappropriation and use of trade secrets in China, even if the product of the misappropriated process is ultimately imported into the United States.
II.
The problem underlying the majority’s analysis is that “[fjoreign conduct is generally the domain of foreign law.” Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 455, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (internal quotations omitted).[8] I sympa *1343 thize with Amsted and, if the bad acts were carried out in the United States, would not hesitate to find for Amsted. My sympathy, however, is somewhat muted since Amsted had a ready-made solution to its problem: obtain a process patent. The statute is clear that the extraterritorial acts in this case are subject to § 337 if the process is protected by a patent. In the alternative, Amsted could have also protected its intellectual property by keeping the various processes completely secret. Instead, Amsted chose to deny the public full knowledge of its innovation while simultaneously exploiting the trade secret by licensing it to a Chinese corporation for use in China.
By broadening the scope of trade secret misappropriation to the extraterritorial actions in this case, the majority gives additional incentive to inventors to keep their innovation secret. Of course, this also denies society the benefits of disclosure stemming from the patent system, which are anathema to trade secrets. Moreover, while Amsted (or more likely its Chinese licensee) will benefit from this decision, the burden of preserving Amsted’s trade secret now falls squarely on the American consumer who misses out on the opportunity for increased competition and concomitant lower prices offered by TianRui’s products.
I understand a restrictive approach to extraterritoriality is not immediately popular in this case. We must, however, work within the confines of the statute and the clear presumption against extraterritoriality. It is not our role to decide what the law should be but to apply it as we find it.

. Amsted does argue that some of TianRui’s acts, such as TianRui’s marketing and certification efforts, constitute misappropriation of the trade secret in the United States. The majority, however, explicitly rejected these arguments: "we reject Amsted's argument that TianRui’s marketing and certification efforts in (his country qualified as acts of ‘use’ of Amsted’s trade secrets (and thus constituted acts of misappropriation). That conduct may have exploited the earlier misappropriation but it cannot reasonably be viewed as misappropriative conduct without a breach of a duty of confidentiality.” Maj. Op. at 1328 n. 1.

. The court held that amending the statute "strongly suggests that Congress intended extraterritorial application.” Villanueva, 408 F.3d at 198. Moreover, the illegal immigration cases present a completely different issue than § 337: an illegal alien’s presence in the United States is, by definition, the prohibited act. In contrast, there is nothing illegal about having TianRui's wheels in the United States and nothing unfair about TianRui's acts in importing them. The only allegedly unfair act was their manufacture, which occurred entirely in China and is beyond the reach of our domestic trade secret laws.

. At the time of Amtorg, 35 U.S.C. § 271(g) did not exist.

. The majority sidesteps this problematic issue by declaring that trade secret misappropriation is different from Amtorg and other cases dealing with patents, which consistently hold that § 337 cannot be applied extraterritorially. The majority argues that “[tjhose decisions focused on statutory provisions specific to patent law, especially the territorial limitations in the patent granting clause.” Maj. Op. at 1333. The focus on the express territoriality of our patent laws, however, turns the default rule against extraterritoriality on its head: unless a statute gives a “clear indication of an extraterritorial application, it has none.” Morrison, 130 S.Ct. at 2878 (emphasis added). Even if our patent laws had no territorial limitations, it would not change the outcome of Amtorg or any of our other cases involving § 337. Moreover, our trade secret laws are no less territorial than our patent laws.

. We previously recognized both the limited scope of § 337 and the narrow extraterritorial authorization of the process patent exception enacted in § 1337a. Amgen, Inc. v. U.S. Int’l Trade Comm’n, 902 F.2d 1532, 1537-40 (Fed. Cir.1990).

. The majority cites other sentences that indicate that § 337’s predecessor (§ 316), would “broadly” prevent unfair competition — but saying it is broad is not the same thing as saying it applies extraterritorially. The statute does broadly cover everything from acts of bribery to false labeling to price fixing to patent infringement.

. The majority claims the single ambiguous sentence from 1922 and the Commission case Certain Processes for the Manufacture of Skinless Sausage Casings and. Resulting Products, Inv. No. 337-TA-148/169, USITC Pub. 1624 (Dec. 1984) (Sausage Casings) means that the Commission has construed § 337 to reach misappropriation that occurs entirely abroad, and suggests that this interpretation should be given deference. Maj. Op. at 1332. The issue of extraterritoriality, however, was neither raised by the parties nor analyzed by the commission in Sausage Casings, which focused on whether the producer independently developed its process. There is no reasonable statutory interpretation deserving deference in Sausage Casings.

. The majority claims there is no conflict between trade secret laws in the United States and China, and concludes that the absence of conflict supports granting "relief based on extraterritorial acts of trade secret misappropriation relating to the importation of goods affecting a domestic industry." Maj. Op. at 1333. This conclusion, however, conflicts with the Supreme Court’s explanation that "[t]he canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law." Morrison, 130 S.Ct. at 2878. The issue here is the Commission’s authority to punish TianRui, whose acts in the importation of its wheels give rise to no cause of action, based on wholly extraterritorial acts carried out in China. Even if Chinese trade secret laws were identical to our laws, this does not give the Commission the power to interpret and apply Chinese laws to TianRui's unfair acts in China. If there has been some violation of Chinese law, any remedy must come from Chinese courts.