PER CURIAM: *
Jose Luis Ceballos-Amaya (Ceballos) and Misael Peralta-Longoria (Peralta) *256 were indicted for one count of aiding and abetting the possession with intent to distribute 100-1000 kilograms of marijuana and one count of aiding and abetting the possession with intent to distribute 50-100 kilograms of marijuana. A jury found them guilty as charged. Ceballos appeals, challenging the sufficiency of the evidence to support his convictions. Ceballos also challenges his sentence, arguing that the district court erred in applying an enhancement for obstruction of justice and an enhancement based on his leadership role in the offense. Peralta appeals only his sentence, arguing that the district court erred in applying an enhancement for obstruction of justice. We find the evidence sufficient to sustain Ceballos’s convictions and AFFIRM his convictions. Finding no reversible error, we AFFIRM Ceballos’s sentence. Concluding that the district court clearly erred in applying an enhancement for obstruction of justice, we VACATE and REMAND Peralta’s sentences for re-sentencing.
I. FACTUAL AND PROCEDURAL HISTORY
On April 9, 2009, Border Patrol Agent Jason Denman (Agent Denman) was traveling down Highway 170 and observed a black Tahoe and a white Ford pickup truck traveling in tandem. Subsequently, Agent Denman conducted a stop of the Ford, while Border Patrol Agent Steve Randall (Agent Randall) conducted a stop of the Tahoe.
The driver of the Ford, identified as Gilbert Vasquez, was the only occupant of the vehicle. The vehicle was taken to the Presidio, Texas station to be searched, and marijuana was discovered hidden in the fuel tank. Agent Randall testified that he ran a license plate check on the Tahoe and discovered that the vehicle was registered to Cesar Pinedo. The vehicle and the driver, Bruce McGraw (McGraw), were likewise taken to the Presidio station. Marijuana was found in the vehicle. The amount of marijuana found in both vehicles totaled 89.6 kilograms.
At the trial in the instant case, Vasquez testified that he met Cesar Pinedo (Pine-do) and an individual identified only as Abraham, when they worked at F & W Coating. Subsequently, Abraham called Vasquez to offer him work. Abraham arrived at Vasquez’s house with two other men to discuss the offer. In court, Vasquez identified Ceballos, previously known to him only as “Loco,” as one of the two men with Abraham. Vasquez also identified Peralta as the other man accompanying Abraham. Abraham told Vasquez that he would give him a white Ford pickup truck and money in exchange for Vasquez coming to Ojinaga, Chihuahua, Mexico, and hauling loads of marijuana across the border. Ceballos was “involved” and “participat[ed] in” this conversation.
Subsequently, Abraham and Peralta brought the truck to Vasquez. Vasquez and McGraw then traveled to Ojinaga. After they crossed the border, Vasquez called Abraham. Abraham arrived in the black Tahoe with Pinedo and Ceballos and took Vasquez and McGraw to a motel outside of Ojinaga. Vasquez testified that Ceballos, Abraham, and Pinedo stayed in the same motel.
On April 8, 2009, Peralta arrived and picked up the truck. Abraham instructed Vasquez and McGraw to remain in the motel because Peralta did not want them to leave “because of the soldiers that were running around there in Ojinaga.” Vasquez also testified that Ceballos and the other men were “keeping an eye on” him while they were staying at the motel, waiting for the truck that was to be used to drive a load of marijuana. Further, Ceballos was with Abraham at the motel when *257 -Abraham told Vasquez “to calm down, that they would have the truck ready.”
On April 9, 2009, at approximately noon, Peralta arrived at the motel and traveled with Vasquez in the Tahoe over the border. Peralta instructed Vasquez to meet him, Ceballos, Abraham, and Cesar in Odessa, where Vasquez would be paid. Pinedo traveled in the Ford with McGraw and another individual identified only as Mingo. Peralta, Pinedo, and Mingo then left the vehicles and returned to Mexico. Vasquez and McGraw separately drove away in the two vehicles but did not travel far before they encountered Border Patrol and were arrested as set forth above.
With respect to the second offense, on the afternoon of January 29, 2010, Border Patrol Agent Alexander Medina testified that he was working at the primary checkpoint in Marfa, when he encountered a suspicious white GMC tractor-trailer. Billy Wayne King (King) was identified as the driver and sole occupant of the truck. During a subsequent search, the vehicle was found to contain marijuana weighing 280.45 kilograms. Border Patrol Agent Ismael Fernandez (Agent Fernandez) of the DEA Task Force asked King whether he would be willing to cooperate in a controlled delivery operation. King agreed, and his phone calls were recorded. As instructed by the agents, King explained his travel delay to the intended recipients of the marijuana, who were later identified as Ceballos and Peralta, by stating that the vehicle had mechanical problems. Ceballos then wired $100 to King so that he could have the vehicle repaired.
Ceballos instructed King to meet them at an Odessa convenience store called Stripes. King and law enforcement authorities separately arrived at Stripes. Ceballos then instructed King to move the delivery to Church’s Chicken Restaurant. After King moved to Church’s Chicken, Ceballos asked him to move the truck again but was instructed by agents to say that the truck was inoperable. Shortly thereafter, Ceballos and Peralta met King at Church’s Chicken. Ceballos opened the hood of King’s vehicle and looked at the engine. After a minute or two, King started the truck. Ceballos entered King’s truck, and Peralta returned to his truck.
At that point, the authorities decided to end the operation and activated lights and sirens. Peralta took off at a high rate of speed but was soon stopped. Ceballos and King were blocked from attempting to escape. After he was arrested, Peralta provided a statement in which he admitted that he knew the truck contained drugs but denied knowledge as to the type of drug. Ceballos denied any knowledge of the drugs.
The recorded phone conversations were presented to the jury. Agent Fernandez explained that the voices were identifiable once he heard Peralta and Ceballos speak. In one phone call, Ceballos identified himself as the individual who would be receiving the truck. In another call, the wire transfer from Ceballos was discussed. In a subsequent call, Ceballos instructed King to go to Stripes. Sergeant Sean Roach of the Brewster County Sheriffs Office testified that he reviewed King’s cell phone and the phone that Ceballos was using. The two phones showed calls to each other. At the close of the Government’s case, both defendants moved for judgments of acquittal, and the court denied the motions.
Ceballos presented the testimony of his wife, Lilliana Ceballos-Amaya.[1] She stated that her mother lives in Ojinaga, and her sister is married to Peralta. On the *258 day of Ceballos’s arrest, Lilliana testified that she and Ceballos had previously been at a birthday party at a Mr. Gatti’s in Odessa for Peralta’s daughter. Lilliana testified that at the time of his arrest Ceballos was working two jobs.
Ceballos testified in his own defense. In April of 2009, he and his wife had driven to Mexico to stay with his mother-in-law and father-in-law, who lived in Ojinaga. While in Ojinaga, Ceballos saw Abraham, whom he had known from high school. Ceballos admitted that he went to the motel where Vasquez was staying because Abraham had told him that they were “partying at this motel.” However, he denied staying overnight and claimed no knowledge of the marijuana. He claimed he cut his family vacation in Mexico short when Pinedo asked Peralta and Ceballos for a ride back to Odessa to report Pinedo’s vehicle stolen. On April 9, 2009, Ceballos, Peralta, Abraham, and Pinedo drove back to Odessa together in one vehicle. Ceballos claimed that he had his wife ride back with her sister to Odessa because he did not want his wife riding with Abraham and Pinedo.
Ceballos further testified that on January 29, 2010, he was getting ready to go to a birthday party for Peralta’s daughter when Peralta called him. Peralta said that his cousin had called from Mexico, asking Peralta to go and help his friend whose truck had broken down in Alpine. The friend was later identified as King. Peralta asked Ceballos to go with him to Alpine, and Ceballos agreed. Peralta called again because he had changed his mind and did not want to drive to Alpine. Instead, he asked Ceballos to wire King $100 to have the truck repaired, and Ceballos did so.
After Ceballos and his wife attended the birthday party, he and Peralta went to Walmart to buy some medicine for Peralta’s child. While they were driving to a Walmart in Odessa, Peralta received a phone call from King. Because Peralta did not speak English, and King did not speak Spanish, Peralta asked Ceballos to assist him in translating the phone call. When Ceballos took the phone, King asked who he was, and Ceballos responded “I’m the one who’s going to receive” the truck. Ceballos testified that he “was going to receive it as like receive it to fix it.” He further testified that he “never said [he] was going to receive the marijuana.” Ceballos admitted to speaking with King numerous times on Peralta’s phone. Ceballos testified that he changed the dropoff location from Stripes to Church’s Chicken because he intended to take the truck to Peralta’s friend’s house to fix it. Ceballos knew that after he and Peralta were arrested Peralta had admitted that he knew there were drugs in the truck. Ceballos, however, claimed he had no knowledge of the drugs.
Mabel Peralta (Mabel) testified that she was Peralta’s wife. She stated that they had lived in Odessa and in June 2009, the family moved to Ojinaga. On January 29, 2010, after having moved back to Odessa, their daughter’s birthday party was held at Mr. Gatti’s. After the party, Peralta and Ceballos went to Wal-Mart at her request to purchase “milk and stuff’ for the children.
At the close of all evidence, both defendants again moved for an acquittal, and the district court denied the motions. The jury returned a verdict, finding both defendants guilty on both counts.
Ceballos’s presentence report (PSR) assessed a base offense level of 26. The PSR recommended a four-level increase for being a leader or organizer and a two-level increase for obstruction of justice. Therefore, Ceballos’s total offense level was calculated at 32. Ceballos objected to both adjustments. The Government responded, arguing that a two-level increase *259 for being a manager or supervisor was more appropriate in the case. The district court agreed with the Government, finding a two-level increase under U.S.S.G. § 3Bl.l(c) was proper. The objection to the enhancement for obstruction of justice was overruled. Ceballos’s total offense level was recalculated to 30. This offense level, combined with a Category III criminal history score, resulted in a guidelines range of 121-151 months. The district court sentenced Ceballos to concurrent terms of 121 months, to be followed by a total of five years of supervised release. Ceballos filed a timely notice of appeal.
Peralta’s PSR assessed a base offense level of 26. He also received a four-level increase for being a leader or organizer and a two-level increase for obstruction of justice. His total offense level of 32, combined with a Category I criminal history score, yielded a guidelines range of 121— 151 months. Peralta objected to both of the adjustments. The district court overruled Peralta’s objections. Peralta was sentenced to concurrent terms of 121 months, to be followed by a total of five years of supervised release. Peralta filed a timely notice of appeal.
II. ANALYSIS
A. Sufficiency of the Evidence (Ceballos only)
Ceballos argues that the evidence presented at trial was insufficient to support his conviction. Ceballos moved for a judgment of acquittal at the close of the Government’s case and again at the close of all the evidence. Accordingly, he preserved the issue for appellate review, and we review his challenge to the sufficiency of the evidence de novo. See United States v. Ollison, 555 F.3d 152, 158 (5th Cir.2009).
This Court will uphold a jury’s verdict if a rational trier of fact could conclude that “the elements of the offense were established beyond a reasonable doubt, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences from the evidence to support the verdict.” United States v. Percel, 553 F.3d 903, 910 (5th Cir.2008) (internal quotation marks and citation omitted). Direct and circumstantial evidence are weighed equally, and it is not necessary that the evidence exclude every reasonable hypothesis of innocence. United States v. Mendoza, 226 F.3d 340, 343 (5th Cir.2000). This Court does “not weigh evidence or assess the credibility of witnesses, and the jury is free to choose among reasonable constructions of the evidence.” United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir.2008).
“To sustain a conviction for possession of marijuana with intent to distribute, the government must prove beyond a reasonable doubt (1) knowing (2) possession of marijuana (3) with intent to distribute it.” United States v. Ricardo, 472 F.3d 277, 282-83 (5th Cir.2006) (internal quotation marks and citation omitted). To prove aiding and abetting, the Government must establish that the defendant “(1) associated with the criminal venture; (2) purposefully participated in the crime; and (3) sought by his actions for it to succeed.” United States v. Pando Franco, 503 F.3d 389, 394 (5th Cir.2007). To satisfy the association element, the Government must show that the defendant shared in the criminal intent of the principal. Participation requires that the defendant engaged in some affirmative conduct designed to aid the venture or to assist the principal.
The Government need not prove that the defendant committed all elements of the substantive underlying offense if he aided and abetted each element. United States v. Aguirre Aguirre, 716 F.2d 293, 298 (5th Cir.1983). Thus, a defendant *260 “need not have actual or constructive possession of the drugs to be guilty of aiding and abetting possession with intent to distribute.” United States v. Williams, 985 F.2d 749, 753 (5th Cir.1993). Although a defendant’s mere presence at the scene of a crime does not establish aiding and abetting, “the jury may consider presence and association as factors in determining whether the defendant is guilty of aiding and abetting.” Id.
Ceballos argues that there was no evidence that he actually or constructively possessed the marijuana and that there was no evidence of shared intent. However, if the Government proved that Ceballos aided and abetted each element of the offense, it need not prove that Ceballos was in actual or constructive possession of the marijuana. See Williams, 985 F.2d at 753.
With respect to the April 2009 offense, Vasquez testified that Ceballos was present with Abraham and Peralta when they drove to his house and presented him with the proposition to make money by hauling loads of marijuana across the border. Ceballos was “involved” and “participat[ed] in” this conversation. Ceballos was also at the motel in Ojinaga. Ceballos admitted to encountering Vasquez at the motel. Vasquez also testified that Ceballos was “keeping an eye on” him while they were staying at the motel, waiting for the truck that was to be used to drive a load of marijuana. Further, Ceballos was with Abraham at the motel when Abraham told Vasquez “to calm down, that they would have the truck ready.” Ceballos’s actions in assisting to recruit Vasquez and in watching over him at the motel show that he shared in the criminal intent and engaged in affirmative conduct to help the venture succeed. See Pando Franco, 503 F.3d at 394.[2]
Additionally, Ceballo’s testimony attempting to explain why he supposedly cut his family vacation short and rode back to the United States on April 9, 2009, with Abraham, Peralta, and Pinedo instead of driving back with his family is rather implausible. The jury was free to reject Ceballos’s testimony that on April 9, 2009, he rode back to the States with these men after Pinedo asked them for a ride because Pinedo’s truck had been stolen. Ceballos’s implausible testimony is circumstantial evidence of guilty knowledge. United States v. Ortega Reyna, 148 F.3d 540, 544 & n. 17 (5th Cir.1998). The jury clearly did not find Ceballos to be credible and thus was free to reject his testimony.
With regard to the January 2010 incident, the evidence established that Ceballos spoke with King numerous times on the phone to set the location for the delivery. The recorded telephone calls revealed that Ceballos identified himself as the one who would “receive” the truck. Once King arrived at Stripes, Ceballos changed the location to a Church’s Chicken Restaurant. Ceballos testified that he changed the location to the restaurant because it would be easier for King to locate. However, this explanation does not make sense because Ceballos changed the location from Stripes to Church’s Chicken af *261 ter King had successfully arrived at Stripes. Additionally, Ceballos attempted to change the location a second time. In sharp contrast to Ceballos’s explanation, Sergeant Roach testified that during controlled drug deliveries subjects will often change the location of the meeting place. The subjects would have “counter surveillance in place to see how many people follow to the new location.” This tactic is referred to as a “heat run,” which is used to determine whether law enforcement officers are observing the transaction. The jury was free to reject Ceballos’s explanation and credit Sergeant Roach’s interpretation of Ceballos’s actions.
Moreover, during one of the phone calls Ceballos referred to himself as the person to “receive” the truck. The jury was free to disbelieve his explanation that “receive” the vehicle meant “fix” the vehicle.
Ceballos admitted to speaking with King numerous times during the day and arranging to meet him. Ceballos’s actions in exiting the vehicle with Peralta at Church’s Chicken, speaking on the phone with King, wiring money to King, referring to himself as the person who would “receive” the vehicle, and entering the vehicle with King all indicate that he was actively participating in the venture. See Pando Franco, 503 F.3d at 394. Ceballos’s story reasonably could have been rejected by the jury as implausible. See United States v. Resio-Trejo, 45 F.3d 907, 911 (5th Cir.1995) (resolving credibility determinations in favor of the verdict). There was sufficient evidence that Ceballos participated in the offense and shared in the intent to possess marijuana with the intent to distribute it. See Pando Franco, 503 F.3d at 393-94. Thus, viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found Ceballos guilty beyond a reasonable doubt. See Percel, 553 F.3d at 910.
B. Enhancement for Leadership Role (Ceballos only)
Ceballos argues that the district court erred in applying a two-level leadership enhancement under § 3Bl.l(c). He contends that the district court, in making the determination to apply the enhancement, relied on evidence in the PSR that was not presented at trial. He further asserts that the evidence in the record shows only that he acted at the direction of Peralta.
Following United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), sentences are reviewed for reasonableness in light of the sentencing factors in 18 U.S.C. § 3553(a). United States v. Mares, 402 F.3d 511, 519-20 (5th Cir.2005). Pursuant to Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007), we must determine whether the sentence imposed is procedurally sound, including whether the calculation of the advisory guidelines range is correct, and whether the sentence imposed is substantively reasonable. Review of the sentence’s reasonableness is for an abuse of discretion. Id. We review the district court’s interpretation and application of the Sentencing Guidelines de novo and its findings of fact for clear error. United States v. Cisneros-Gutierrez, 517 F.3d 751, 764 (5th Cir.2008).
Section 3Bl.l(c) provides for a two-level enhancement if the defendant is an organizer, leader, manager or supervisor of criminal activity. The commentary provides that a defendant qualifies for a § 3B1.1 enhancement if he was the organizer, leader, manager, or supervisor of one or more other participants. § 3B1.1, comment, (n.2). In determining whether a defendant had a leadership role, a court should consider the following factors:
the exercise of decision making authority, the nature of participation in the *262 commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
Id., comment, (n.4).
The PSR indicated that Ceballos identified himself as belonging to La Linea, a drug organization based in Mexico. Ceballos assisted in recruiting Vasquez. Additionally, Ceballos directed King to locations for delivery of the marijuana.
The district court found that the leadership enhancement was warranted because Vasquez indicated that Ceballos was part of the group who recruited him. Ceballos identified himself as working for a drug organization known as La Linea. Additionally, McGraw met with Ceballos, who assisted in recruiting and directing him. The district court noted that the information in the PSR supported his decision.
In determining a defendant’s role in the offense, “a district court may adopt the facts contained in a PSR without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable.” United States v. Cabrera, 288 F.3d 163, 173-74 (5th Cir.2002). Additionally, “a district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error.” United States v. Caldwell, 448 F.3d 287, 290 (5th Cir.2006).
The record supports the district court’s application of the leadership enhancement under § 3B 1.1(c). Ceballos recruited Vasquez and wired $100 to King to facilitate the transfer of a load. Additionally, Ceballos directed King in the delivery of the load. This evidence supports the district court’s finding that Ceballos acted as a leader or organizer. See United States v. Villanueva, 408 F.3d 193, 204 (5th Cir.2005) (affirming four-level leadership enhancement because, inter alia, defendant recruited and hired a driver to smuggle aliens); see also United States v. Giraldo, 111 F.3d 21, 24-25 (5th Cir.1997) (holding that recruitment of others supported findings that the defendant was a leader or organizer).
The dissent would find that the district court erred in applying the leadership enhancement “because there is nothing in the record to indicate that Ceballos served in any kind of leadership role with regard to the 2009 offense.” Dissent at 7. In this regard it faults our view because we consider Ceballos’s conduct surrounding both offenses in evaluating whether the district court properly applied the leadership enhancement. But the guidelines do not require that the conduct surrounding each conviction must independently qualify for the enhancement. “As with the determination of drug quantities, the court may draw on all ‘relevant conduct’ when determining whether the defendant was an ‘organizer or leader’ for the purposes of the guidelines.” United States v. Laboy, 351 F.3d 578, 585 (1st Cir.2003) (citing United States v. Ruiz-Batista, 956 F.2d 351, 353-54 (1st Cir.1992)). Indeed, the “introductory commentary to Chapter 3, part B simply states that the ‘defendant’s role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct) ... and not solely on the basis of elements and acts cited in the count of conviction.” Id. at 586 (quoting U.S.S.G. Ch.3, Pt.B, intro, cmt.) (emphasis added). Thus, in the instant case, the district court properly considered Ceballos’s conduct surrounding both convictions *263 in its application of a two-level leadership enhancement under § 3Bl.l(c).
Finally, to the extent that Ceballos argues the district court erred in relying on information in the PSR, his argument fails. Ceballos offered no evidence at sentencing rebutting the facts in the PSR; thus, this argument is without merit. See Cabrera, 288 F.3d at 173-74. The preponderance of the evidence supports, and Ceballos has shown no clear error in, the district court’s application of the leadership enhancement.
C. Obstruction of Justice Enhancement 1. Ceballos
Ceballos also contends that the district court erred in applying a two-level increase for obstruction of justice. In essence, Ceballos argues that the district court’s application of the enhancement deprives a defendant of his right to assert a defense.
In United States v. Dunnigan, 507 U.S. 87, 88-89, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993), the Supreme Court addressed the issue “whether the Constitution permits a court to enhance a defendant’s sentence under [§ 3C1.1], if the court finds the defendant committed perjury at trial.” The Court held that “[u]pon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines ... [and] [t]hat requirement ... is not in contravention of the privilege of an accused to testify in her own behalf.” Id. at 98, 113 S.Ct. 1111. In so holding, the Court rejected the argument that an enhanced sentence for perjury undermines the right to testify and distorts the decision whether to remain silent. Id. at 96, 113 S.Ct. 1111 (noting that the right to testify does not include the right to commit perjury). Ceballos acknowledges the Supreme Court’s ruling in Dunnigan but maintains that the decision was wrongly decided. As such, Ceballos’s argument is foreclosed.[3]
2. Peralta
Peralta challenges the district court’s imposition of a two-level enhancement for obstruction of justice. He argues that the facts presented at trial do not support the district court’s finding that Peralta suborned perjury by presenting the testimony of his wife. Peralta asserts that his wife did not present an alibi, excuse, or material fact.
Section 3C1.1 provides for a two-level increase in the offense level if “the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction” and this conduct relates to “the defendant’s offense of conviction.” The commentary to the guidelines specifically lists suborning perjury as an example of conduct to which the enhancement applies. § 3C1.1, comment. (n.4(b)).
Perjury is giving “false testimony concerning a material matter with the willful *264 intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.” Dunnigan, 507 U.S. at 94, 113 S.Ct. 1111. “[A] district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition.” Id. at 95, 113 S.Ct. 1111. Although it is preferable for the court to address each element of perjury in a separate and clear finding, it is sufficient if the court makes a finding of obstruction “that encompasses all of the factual predicates for a finding of perjury.” Id. Testimony is material if it was designed to substantially affect the outcome of the case. United States v. Como, 53 F.3d 87, 90 (5th Cir.1995). Subornation occurs whenever the defendant “procures another to commit any perjury.” 18 U.S.C. § 1622. Credibility determinations are within the province of the district court. United States v. Sotelo, 97 F.3d 782, 799 (5th Cir.1996). The district court’s determination that a defendant obstructed justice under § 3C1.1 is a factual finding that we review for clear error. United States v. Juarez-Duarte, 513 F.3d 204, 208 (5th Cir.2008).
After Peralta objected to the obstruction-of-justice enhancement in the PSR, the probation officer responded that Peralta’s wife, Mabel, provided an alibi as to why Peralta was in Mexico at the time of the April 9, 2009 offense. At sentencing, the Government argued that Mabel testified Peralta was in Mexico for a family event and that he crossed the river with Pinedo to report something stolen. Peralta correctly notes that the Government mischaracterized Mabel’s testimony.
At trial, Mabel did not testify that Peralta was in Mexico at a family event in April 2009. Mabel did testify that they moved from Odessa to Mexico in June of 2009, but that does not provide an alibi for the April 2009 offense. Mabel testified that in January 2010, she and Peralta moved back to Odessa. On January 29, 2010, the night Peralta was arrested, she had been at their daughter’s birthday party at a Mr. Gatti’s in Odessa. She further testified that after the party Peralta and Ceballos went to Wal-Mart for “milk and stuff’ for the children. However, this testimony clearly did not provide an alibi for the April 9, 2009 offense in Mexico. Nor did it provide an alibi for the January 29, 2010, offense in Odessa because Peralta was arrested at the scene of the offense and admitted that he knew drugs were in the truck.
At Peralta’s sentencing hearing, the prosecutor, referring to Peralta’s crossing the border in April of 2009, asserted that he had asked Mabel the following question on cross examination: “[wjell, why didn’t you travel with your husband at that time?” He further asserted that she had responded that “ ‘the boys traveled with the boys, and the girls traveled with the girls,’ or something to that effect.” Because Mabel allegedly lied about the reason Peralta was in Ojinaga, the prosecutor argued that the enhancement should apply. The prosecutor was mistaken. Actually, it was Ceballos who testified that he was in Ojinaga with family on April 9, 2009. It was Ceballos who testified that the men and women drove back to Odessa separately. Ceballos testified that he had his wife ride back from Mexico with her sister because he did not want his wife riding with the two other men, Abraham and Pinedo. He testified that the reason he crossed the border with Peralta, Pinedo, and Abraham was to report Pinedo’s vehicle stolen. Ceballos’s testimony, however, was not the basis for Peralta’s obstruction enhancement. Nonetheless, the district court applied the obstruction enhancement, expressly finding that Peralta “al *265 low[ed] his wife to testify and to provide an alibi as to why the Defendant was in Mexico on or about April 9, 2009, which is Count Two of the indictment.” As set forth above, Mabel gave no testimony regarding Peralta’s presence in Mexico on April 9, 2009. Thus, the district court’s factual finding in support of the obstruction-of-justice enhancement is clearly erroneous.
Moreover, there is no indication that Mabel’s testimony was deliberately false or material. It is unclear how Mabel’s testimony concerning Peralta’s whereabouts prior to his arrest on the night of January 29, 2010; would assist Peralta’s defense because he was arrested at the scene of the offense, and it is undisputed that he admitted to knowledge of drugs in the truck. The district court erred in applying this enhancement.
The Government argues that even if the court erred in applying the enhancement, any error would be harmless because Peralta’s sentencing range would be 97-121 months, and his sentence of 121 months falls within that range. His sentence would be presumed reasonable, and Peralta fails to rebut the presumption of reasonableness.
But for the error, Peralta’s guidelines range would have been 97-121 months with a total offense level of 30 and a Category I criminal history score. If a district court committed a procedural error, the appellate court must remand unless the error was harmless. United States v. Delgado-Martinez, 564 F.3d 750, 753 (5th Cir.2009). “A procedural error during sentencing is harmless if the error did not affect the district court’s selection of the sentence imposed.” Id. (internal quotation marks and citations omitted). The proponent of the sentence bears the burden of establishing that the error was harmless and “must point to evidence in the record that will convince [the reviewing court] that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error made in arriving at the defendant’s guideline range.” Id. (internal quotation marks and citations omitted).
In United States v. Ibarra-Luna, 628 F.3d 712, 713-14 (5th Cir.2010), this Court recognized that an error can be harmless even if the district court did not consider the correct guidelines range in its analysis. However, such an error is harmless only if two requirements are met. Id. at 717-19. First, the Government must “convincingly demonstrate that the court actually would have followed the very same reasoning absent the error.” Id. at 717. Second, the Government “must show that the ... sentence the district court imposed was not influenced in any way by the erroneous Guidelines calculation.” Id. at 719.
Here, the district court imposed a sentence at the bottom of the higher, incorrect guidelines range and stated that the guidelines range was “fair and reasonable.” We see nothing in the record to indicate that the district court’s reasoning in choosing a sentence would have been the same had it been confronted with a guidelines range of 97-121 months. The Government has not shown that Peralta’s sentence was not influenced by an erroneous calculation. See Ibarra-Luna, 628 F.3d at 717-19.
III. CONCLUSION
For the above reasons, we AFFIRM the convictions and sentences of Ceballos. We VACATE the sentences of Peralta and REMAND for re-sentencing in accordance with this opinion.

 Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir R. 47.5.4.

. Although Lilliana is referred to as Ceballos’s wife, during her testimony she stated that they were not married but were "just living together.”

. The dissent apparently discounts Vasquez’s testimony because he did not testify as to Ceballos's specific statements and also parses through Vasquez’s testimony attempting to cast doubt as to Vasquez’s identification of Ceballos. Dissent at 2-4 & n. 2. Further, the dissent attempts to discredit Vasquez's testimony because he had been drinking alcohol when he observed Ceballos at the hotel. Id. at 4. "It is not our role, however, under our standard of review for sufficiency of the evidence, to second-guess the determinations of the jury as to the credibility of the evidence.” United States v. Guidry, 406 F.3d 314, 318 (5th Cir.2005).

. The dissent would find the district court erred in applying a two-level enhancement for obstruction of justice. Dissent at 12-16. But the rationale and arguments advanced in the dissent to support such a view are not advanced in Ceballos's brief on appeal and therefore are not properly before us. As we view Ceballos’s brief, he is raising one argument — that the Supreme Court wrongly decided Dunnigan, 507 U.S. 87, 113 S.Ct. 1111, in order to preserve it for further review. Specifically, Ceballos’s brief provides that: "With due respect to the Supreme Court and the precedent established by Dunnigan, the undersigned feels morally obliged to once again raise this issue due to its continuing Constitutional implications.” Blue brief at 28. Accordingly, we address the only claim that Ceballos makes with respect to his obstruction of justice enhancement.